### THE NEREUS.[1]

### THE JAMAICA.[1]

### NASSAU FERRY CO. v. THE NEREUS, etc.[1]

### METROPOLITAN S. S. CO. v. THE JAMAICA, etc.[1]

*(District Court, S. D. New York. March 5, 1885.)*

1. COLLISION — SIMULTANEOUS WHISTLES — ANSWER — INSPECTOR'S RULES — DEPARTURES.

Steamers must be held to the same care and skill in the use of their whistles as in the use of the helm or engine. In the night-time, when the puffs of steam that accompany steam-whistles cannot be seen so as to correct any imperfections in the hearing of simultaneous signals, pilots have no right to rely upon simultaneous signals as an "answer" to each other under the inspector's rules. They are not an equivalent to an "answer," because attended by uncertainties in hearing, to which an "answer" is not subject. Departures from the rules are at the risk of those who adopt them.

2. SAME — CROSSING COURSES — CONFUSION OF SIGNALS — CASE STATED.

As the steamer N. was coming down the East river, shortly after dark, the ferry-boat J., about 400 yards ahead of her, left her slip, in a strong flood-tide, to cross from Brooklyn to Houston street, New York, and gave the N. a signal of two whistles in order to go ahead of the N. The N., at about the same instant, gave one whistle to the J., meaning that the J. should go astern. The court found that one blast from each boat was drowned by the other's whistle, so that the J. did not hear the N.'s one whistle at all; and the N. heard only the J.'s last blast about a second after her own, and treated it as an assent to her one whistle to go astern. The N., a few seconds after, gave a signal of two whistles to some other boats much further down river, which the J. interpreted as an assent to her own previous signal of two whistles, and went ahead. A collision ensued. *Held,* that the collision was due to the confusion and misunderstanding of signals; and, specially, to the N.'s last two whistles which induced the J. to go ahead; that the N.'s pilot knew, or ought to have perceived, that the J.'s one whistle, heard by him about a second only after the N.'s one whistle, came too quick to be a possible answer to his own whistle, but must have been a contemporaneous, original signal from the J.; that the liability of simultaneous signals in the night-time to be imperfectly heard made it incumbent on the N.'s pilot to repeat his signal, and to "answer" the known original signal of the J., as required by the inspector's rules, and also bound him to take special caution not to mislead the J., as he did, by giving, unnecessarily, the two whistles to the other distant boats, at the moment when an answer to the J. was due; and that the N. was answerable for these faults in the use of her whistles.

3. RULE 20 — KEEPING OUT OF THE WAY — BURDEN NOT SHIFTED BY ASSENTING WHISTLES — DANGEROUS MANEUVERS.

Two whistles given in reply to a signal of two whistles from a steamer bound

[1] Reported by R. D. & Edward Benedict, Esqs., of the New York bar.

to keep out of the way, mean only assent to the latter's course, at her own risk, and an agreement to do nothing to thwart her. It does not relieve the latter of her statutory duty to keep out of the way. But when collision becomes imminent, both are bound to do all they can to avoid it, whether the previous signals were of two whistles or one. If imminent risk of collision is involved in the maneuver assented to, and the maneuver was unnecessary, both are responsible for agreeing upon a hazardous attempt.

4. SAME—MISJUDGMENT OF DISTANCE.

The J. being by rule 20 bound to keep out of the way, and being safe at her slip, *held* that, considering the nearness of the N., it was rash and unjustifiable in the J. to leave her slip and attempt to cross the N.'s bows, even on apparently assenting signals, because thereby a collision could not be avoided, except by the N.'s immediately stopping and backing, a concession not implied by assenting signals, and one so unusual and extraordinary in a large steamer having the right of way that the J. had no right to exact or to expect it; that the J. was liable for attempting this maneuver unnecessarily, and in violation of her duty to go to the right; that the attempt was based on a great misjudgment as to the distance of the N., for which the J. was also responsible.

5. SAME—IMMATERIAL FAULTS—SUBSEQUENT CORRECTION—BURDEN OF PROOF.

The rule that previous faults, not directly involving risk of collision, will not be deemed proximate or material if, notwithstanding such faults, there was ample time and opportunity to avoid the collision by the use of ordinary skill and judgment, has no application to situations almost *in extremis*, or within the limits of an excusable error of judgment. The burden of proof is upon the vessel that seeks to exempt herself from the consequences of a previous fault, to show timely notice to correct it and ample means of doing so by the use of ordinary judgment and skill. The N. not having proved such means at the time of her subsequent one whistle to the J., *held*, that both steamers were in fault, and the damages were divided.

In Admiralty. Collision.

The above cross-libels were filed by the respective owners of the steam-ship Nereus and the ferry-boat Jamaica, to recover their damages arising out of a collision between these boats in the East river, about opposite North Second street, Williamsburg, at about half past eight o'clock, on the evening of June 6, 1883. The ferry-boat was crossing from Grand street, Williamsburg, to Houston street, New York, nearly directly opposite. She was not quite half-way across the river, and was still heading slightly up stream, when she was struck by the stem of the Nereus on the axis of the shaft of her starboard wheel-house, and her machinery immediately stopped, broken, and twisted, causing large damages, for which $10,250 is claimed. The stem of the Nereus was twisted by the blow to starboard, and her alleged damages amount to upwards of $5,000. At the time of the collision the tide was strong flood; the evening mild, a little hazy, but otherwise clear; the wind light, from the south-west, and it was not yet quite dark.

The Nereus was a wooden-built right-handed propeller of 1,167 tons, 228 feet long, and 40 feet deep, bound from Boston to New York by way of Long Island sound. In coming down the river, she passed a short distance to the eastward of the Tenth-street buoy, and thence, upon her usual course under a wheel slightly ported, she headed a little towards the New York shore, being a little upon the Brooklyn side of the middle of the river. Shortly before the Jamaica left her slip, the ferry-boat George Law left the slip adjoining to go to Grand

street, New York. She drifted up the river somewhat with the strong flood-tide, and crossed the course of the Nereus at the estimated distance of 150 to 200 yards below her. A few seconds afterwards the pilot of the Nereus, seeing the Jamaica moving out of her slip, gave her one whistle, indicating that she should go astern of him. According to the testimony of the Nereus, one blast of the whistle of the Jamaica was heard in reply, and only one. But the testimony of several witnesses from the Jamaica shows that the signal given by the Jamaica was a signal of two blasts, and that no whistle at all was previously heard from the Nereus. Directly afterwards the Nereus gave a signal of two blasts of her whistle designed for the ferry-boat Commodore, the companion of the George Law, which had left the Grand-street ferry, New York, and was then about half a mile below coming up the river on the New York side. These two whistles were understood by the Jamaica as an assent to her own previous signal of two whistles given to the Nereus. As the Jamaica went out of her slip, the strong flood-tide swept her bows as usual up the river. She started with engines at full speed, and with a wheel hard a-starboard, as usual at that time of tide, so as to counteract as quickly as possible the upward sweep caused by the tide. According to the testimony for the Nereus, when the Jamaica was about 150 or 175 feet above the Grand-street pier, and about 150 feet out from the end of it, and when her bows were pointing directly for the Nereus, the latter again gave one blast of her whistle, to which the Jamaica immediately replied with two blasts, and kept on at full speed, under a hard a-starboard helm as before. The Nereus, upon signaling the George Law, had slowed her engine and continued under a slow bell until the contrary signals above stated, when her engines were stopped. A few seconds afterwards the Jamaica gave several short blasts of her whistle as a danger signal; whereupon the Nereus reversed, full speed, as soon as possible, and her engine was backing at the collision. Her own witnesses testify that at the time of the collision she was going backward by land, so that the street lights of North Second street, which had before been passed and closed in, again opened before the collision, as the Nereus receded backwards. Whether this was, in fact, before the collision, or after, is doubtful. The flood-tide was then running at the rate of about three or three and a half knots. It is not claimed that the Nereus had any backward motion through the water.

On the part of the Jamaica it was contended that the Nereus at the time of the collision was still going forward by land, and struck the Jamaica with great force; that her port wheel thwarted the effort of the Jamaica to keep out of the way; that the exchange of contrary signals took place when the Jamaica had nearly reached the line of the course of the Nereus; that the two whistles given by the Nereus directly after the two whistles of the Jamaica, on starting from the slip, justified the pilot of the Jamaica in his belief that they were de-

signed as a reply to the previous two whistles of the Jamaica, and bound the Nereus to act accordingly; and that had the Nereus thereupon either not ported or reversed in time, as she might easily have done, the collision would not have happened.

*Wm. G. Choate,* for the Jamaica.

*R. D. Benedict,* for the Nereus.

BROWN, J.   The direct cause of this collision was, doubtless, the confusion and misunderstanding of whistles.   Taking all the evidence together, I have no doubt that the pilot of the Nereus gave one whistle only to the Jamaica when she started from her slip, and heard one, and only one, blast in supposed reply; thereby understanding that the Jamaica would go to the right and astern of him.   Neither have I any doubt that this signal of one blast from the Nereus was not heard on the Jamaica; nor that the Jamaica, on starting, did give two blasts of her whistle, indicating that she would pass ahead and not astern, and that she almost immediately afterwards heard two whistles from the Nereus apparently in reply, which she had a right to understand as an assent and agreement to this mode of passing each other.   Thus the whistles, as *heard* by each, and supposed to be in reply, were in fact directly contrary to those actually given and intended by each for the other; and this mistake, as I have said, was evidently the principal cause of the collision.   That this mistake actually occurred on both sides does not rest upon the naked statements of the witnesses as to the whistles given and heard.   The navigation of each vessel at the time was clearly in accordance with the signals as heard from the other; while, on the other hand, it is not credible that either vessel would have maneuvered in the way she did, had the signals of the other been heard and understood as given and intended.

As this mistake in the whistles led to the collision, it is necessary to inquire by whose fault the mistake arose.   If it arose through any negligence of the pilot of either in attending to the whistles of the other, or in managing his own whistles, such negligence would be necessarily held a fault.   In a crowded harbor like this the use of signals is indispensable.   They constitute a language by which navigation is controlled.   They are one of the chief means adopted in order to avoid collisions.   Necessarily, they control and supersede, in some degree, the general rules applicable in the absence of signals; and, considering what is at stake in life and property, it is manifest that due care, attention, and skill are as necessary in the use of signals as in the use of the helm, engine, or sails; and any negligence as to the former is as perilous and as blamable as negligence in regard to the latter.   The Jamaica had no lookout forward, but her pilot in the pilot-house above had the Nereus in full view from the start.   He was giving attention to her, and heard her two whistles directly after his own; so that there is no reason for supposing that the single whistle of the Nereus, which was given after he started, was not heard in consequence of any want of a lookout forward, or of any inatten-

tion on his part.   On the Nereus there was a proper lookout, both forward and in the pilot-house, and yet only one blast of the Jamaica's whistle was heard, although two were given.   The failure of each to hear one of the blasts of the other was doubtless the result of a single cause, all the requisite conditions of which here existed, and which may be explained as follows :

The Nereus was at that time probably about opposite North-Fourth street, or between that and North Fifth street, and from 1,000 to 1,200 feet distant from the Jamaica.   Sound will traverse this distance in a second or a little over.   The ordinary signal blasts are about a second long; and where more than one is given, they are separated by about a second's interval.   Each pilot testifies that his own first signal to the other was given as the Jamaica was just leaving her slip; the Jamaica's being given when her colored lights were just outside the rack. If the Jamaica's signal of two whistles was given one second before the' signal of the Nereus, the Jamaica's first blast would reach the Nereus at the same moment with the one blast of the Nereus, and would therefore be drowned by it so as not to be heard.   In the same way the single blast of the Nereus would reach the Jamaica so as to be exactly contemporaneous with the second blast of the latter, and therefore not heard at all on board the Jamaica; while the second blast of the Jamaica would reach the Nereus one second after her own single blast, and accord with the testimony of the Nereus that only one blast from the Jamaica was heard in reply.   The two whistles immediately afterwards given by the Nereus, but designed for the Commodore and a tow half a mile down the river, would naturally be understood as a reply of the Nereus assenting to the Jamaica's signal of two whistles.   I think the weight of evidence is that it was so near dark that puffs of steam accompanying the whistles could not be seen, and were not seen by either vessel.   It seems impossible, therefore, to ascribe the mistake as to the signals heard to any negligence or inattention in the pilots. If this account of the failure to hear the whistles as given be correct, and no other has been suggested as possible, it necessarily follows that the second blast of the Jamaica's first signal must have been heard on the Nereus only about a second after her own single whistle. This was too soon to have been a possible reply to the signal of the Nereus, at the distance the two vessels were then apart.   The time necessary to give signals and obtain a reply must have been perfectly familiar to the pilot of the Nereus, as a practical fact of constant observation; and it ought, therefore, to have been observed and noted by the pilot of the Nereus that the Jamaica's whistle could not possibly have been given in reply to his own; and if not given in reply to his own whistle, he had no right to accept it, or to act upon it as a reply.

It is immaterial, however, whether the explanation above given of the failure of each to hear the other's signal as actually given, be strictly correct or not.   The evidence leaves no reasonable doubt of

the fact that one blast from each was drowned, so as to prevent the hearing of it by the other pilot, by his own whistle. Neither signal was, therefore, a reply to the other. Each was an independent signal given to the other; and in that sense they must be treated as contemporaneous signals. The two blasts from the Jamaica, given in the ordinary way, were so near together that the first blast being drowned by the single blast of the Nereus, her pilot, as I have said, must have known, or ought to have known, that the second blast, that came immediately after, could not possibly be an answer to the signal of the Nereus, but must have been an original, contemporaneous whistle of the Jamaica. The most simple illustration, such as two taps a second apart, will show even to one unfamiliar with such observations that a second whistle, so soon after the first, could not possibly have come as an answer to the first, a fifth of a mile distant. The fact, which the pilot of the Nereus must therefore be taken to have known, that the Jamaica's whistle was an independent signal, contemporaneous with his own, ought to have suggested to him, in the night-time, when no puffs of steam could be seen, that his own whistle might not have been heard at all, and that the Jamaica's signal might have been imperfectly heard by him. Ordinary prudence, therefore, required him to repeat his signal, and also carefully to avoid giving any different whistles to other boats at the same time that might mislead the Jamaica. Rule 2 of the inspectors' regulations expressly requires that steamers approaching, like these, in an oblique direction "shall pass to the right, and that the signals by whistle shall be given and answered promptly." Rule 6 requires, in general, an "answer" to all signals to each other, whether passing to starboard or port. See *The B. B. Saunders*, 19 FED. REP. 118. The pilot of the Nereus did not *answer* at all to the blast that he heard from the Jamaica; but at the time when such an answer naturally would and should have been given, he gave a signal of two whistles to other boats a considerable distance below. There was danger from the Jamaica, which was coming out of her slip and close at hand, unless an understanding with her were had at once; there was no present danger from the boats so far below, and no urgency for immediate signals to them. In this situation the Nereus was in fault for not *answering* the known original signal from the Jamaica, and for not repeating her former signal; and still more for giving the signal of two whistles designed for other boats, just at a time when an answer to the Jamaica's signal was due. These two whistles were calculated to mislead the Jamaica. They did mislead her, and induced her to go ahead, and thus brought about the collision. The pilot of the Jamaica, on the other hand, had no knowledge or notice of any previous whistle of the Nereus; he was therefore fully justified in treating her two whistles, coming immediately after his own, as intended to be a reply and an assent to his own signal of two whistles, authorizing him to go ahead.

It is urged, however, that contemporaneous whistles in the crowded

navigation of this harbor are of common occurrence; that they are constantly acted upon and treated as a compliance with the inspectors' regulations, requiring an "answer;" and that it is not necessary that the answer be given afterwards, but only that the two steamers shall agree upon the same signal. There was no evidence before me as to the actual practice of pilots on this subject. Doubtless, however, if the two vessels do really agree upon the same signal, and each understands and knows the agreement, the object of the rule is accomplished, and no harm could arise from the want of a literal observance of it by a strictly answering signal. In the day-time pilots watch the vessels they are signaling. By the accompanying puffs of steam, they *see* the whistles as well as hear them. They rely upon sight, also, to identify the whistle heard with the vessel that gives it. In the case .of contemporaneous whistles they perceive and know, by means of sight, the whole signal given, whether fully heard or not. Thus sight, in the day-time, may possibly be relied on to correct with certainty any imperfections of hearing. But in the night-time there are no such means of correcting any imperfect hearing of contemporaneous whistles. When known to be contemporaneous, the liability of misunderstanding in the night-time, through imperfect hearing, is manifest. The object of the inspectors' regulations is to give each steamer knowledge—*i. e.*, a certain knowledge—of the intended movements of the other. To allow contemporaneous whistles in the night-time to stand as "answers" to each other, when the signals under such circumstances are necessarily liable to be wholly or partly drowned by each other, and therefore imperfectly heard, would be to sanction a departure from the rules requiring answering signals that would defeat their very object. The undoubted rule of law is that every departure from the literal observance of prescribed regulations is at the risk of the vessel adopting it. She must show affirmatively that her departure from the rule could have made no difference in the result. In the case of *The Pennsylvania*, 19 Wall. 125, 135, it is said: "The bark had no right to substitute any equivalent for the signal required by the navigation rules. In the case of *The Emperor*, [Holt, Rule Road 38,] it was said, 'It is not advisable to allow these important regulations to be satisfied by anything less than a close and literal adherence to what they prescribe.'" Had an *answer* been given by the Nereus as required, this collision would not have happened. Her previous contemporaneous whistle was not an equivalent, or a lawful substitute, for an "answer," in the night-time, as the circumstances of this case forcibly demonstrate. To sanction such a departure as a substantial compliance with the rule would be as contrary to legal authority as it would be dangerous in practice.

2. The Jamaica, having heard the two whistles by the Nereus as an apparent assent to her own, with no notice of any previous dissenting signal, is entitled to whatever benefit, as a defense, such assenting signal could give her; but it is not, in my judgment, sufficient

to justify her navigation. At the time she came out from her slip, the Nereus, as the weight of evidence shows, was not above 1,200 feet distant, or about off North Fourth street; or possibly a little ab.ve. The witnesses for the Nereus make her much nearer. In the strong flood-tide, the Jamaica would necessarily run up to North Second street, or at least half way up to the Nereus, before she could cross her course. The Jamaica, having the Nereus upon her own starboard hand, was bound to keep out of the way; and all she had to do to effect that was either to remain in her slip a half minute longer, or, if she started out, to go to the right, as required by the inspectors' regulations. By either course all danger would have been avoided.

The Jamaica's proposal to cross ahead of the Nereus in so short a space as was available to her was, therefore, clearly rash and hazardous. It was courting danger by running needlessly directly into it. Had the pilot of the Jamaica realized how near the Nereus was, his starting out of the slip and proposing to run ahead of her, without the slightest necessity or occasion for doing so, must have been judged unjustifiable and foolhardy in the extreme. His proposal to do so, by the two whistles given, was, however, based upon a wide miscalculation as to the distance of the Nereus at that time. He testifies that he judged her to be opposite North Eighth or North Ninth street, or nearly twice the distance she actually was. He is responsible for so great an error in judgment. The Nereus was in fact so near that any attempt to pass her bows in that manner was dangerous and unjustifiable, whether on agreed signals or not; and if there had been actually assenting signals between the two vessels agreeing upon this mode of passing each other, it would have been at the risk of both, because a grossly hazardous undertaking, adopted without necessity, and in direct disobedience of the rule to go to the right. *The City of Hartford*, 11 Blatchf. 72, 75.

A steamer bound to keep out of the way of another steamer by going to the right, under the inspectors' regulations, has no right, when under no stress of circumstances, but merely for her own convenience, to give the other steamer a signal of two whistles, importing that she will go to the left, unless she can do so safely by her own navigation, without aid from the other, and without requiring the other steamer to change her course or her speed. Otherwise she would be imposing upon the latter steamer more or less of the burden and the duty of keeping out of the way, which by statute is imposed on herself. When two blasts are given under such circumstances, the steamer bound to keep out of the way thereby in effect says to the other: "I can keep out of your way by going ahead of you to the left, and will do so if you do nothing to thwart me; do you assent?" A reply of two whistles, in itself, means nothing more than an assent to this course, at the risk of the vessel proposing it. Such a reply does not of itself change or modify the statutory obligation of the former to keep out of the way as before, nor does it guaranty the

success of the means she has adopted to do so. *The City of Hartford, supra; The Vanderbilt,* 20 FED. REP. 650.

But from the moment that such an attempt apparently involves risk of collision, both steamers are equally bound to do all they can to avoid a collision; and under rule 21 they may each be bound to slacken speed, or to stop and reverse, according to the circumstances. But this general obligation under rule 21 applies equally whether the previous signals were of two whistles or of one. The precise acts which either is bound to do, when immediate danger of collision arises, must depend upon the particular circumstances, and of these circumstances the previous understanding as to the course or intention of each vessel is one of the most important. But where the circumstances are such that a course proposed by a signal of two whistles would, if assented to and adopted, require at once, as in this case, immediate and strong measures to avoid a collision, there can be no question that such a proposal is wholly unjustifiable, and a gross fault, when proposed by a steamer that is bound to keep out of the way, and is under no constraint of circumstances, but free to pursue other safe methods of doing so.

The Nereus was a large steamer coming down nearly in the middle of the river, and having the right of way. The Jamaica was in a safe place in her slip. Clearly, she could not be justified in starting out and crossing the Nereus' course, when this would almost certainly bring on a collision unless the Nereus should at once adopt the unusual and extraordinary course of immediately stopping and backing in order to let the Jamaica run ahead of her. The pilot of the Nereus clearly had no such expectation; for he supposed the Nereus far enough off to enable him to pass without any such extraordinary concession from her. The answer of two whistles did not, therefore, import to him any such concession. It was no part, therefore, of the supposed agreement between them, as the Jamaica actually understood it; and whatever be the fault of the Nereus, it does not exempt the Jamaica.

As respects the charge of fault against the Jamaica, the only inquiry is whether she did perform, or could perform, the apparent agreement as she actually understood it, and had an apparent right to understand it. Her supposed agreement by the two whistles imported, as I have said, that she would avoid the Nereus by going ahead of her, if the latter did nothing to thwart her. The slight porting of the Nereus was not, in my judgment, sufficient to affect the result; and the Jamaica did not and could not avoid her in the way she proposed and undertook. Had she appreciated the actual nearness of the Nereus at the time when her signals were given, that course would not have been proposed by her; because her pilot would have known that it was clearly hazardous, and that it involved an unjustifiable interference with the Nereus' right of way, and an imminent risk of collision, unless the Nereus immediately stopped and backed,—an ex-

traordinary maneuver, which, under the circumstances, the Jamaica would have no right to ask, or to seek to impose upon her. Tested by what her pilot actually judged and understood, the Jamaica cannot be justified; because she did not and could not keep out of the way of the Nereus by going ahead of her, though the latter did nothing to thwart her; but, on the other hand, gave her some aid by backing, which the Jamaica did not expect, and had no right to exact. And, on the other hand, if judged according to the fact of the actual nearness of the Nereus, the Jamaica is responsible for gross error in judgment as to the distance of the Nereus, and for undertaking a most hazardous maneuver, in violation of the regulations requiring her to go to the right, without any exculpating reasons for such a course.

3. On the part of the Nereus, however, it is claimed that, though she be treated as having originally agreed to the Jamaica's proposal, because her two whistles might have been so understood by the Jamaica, still, the whole damages from the collision should be charged upon the Jamaica, because after the Jamaica had got out into the stream the Nereus gave her a signal of one whistle to go astern, and that there was then sufficient time and opportunity for the Jamaica to do so; but that, notwithstanding, the Jamaica rashly persisted in her original attempt, replied again with two whistles, and kept on with unabated speed until the collision took place. If the evidence fairly warranted this contention, and showed clearly that there was abundant time and opportunity after this last signal whistle of the Nereus for the Jamaica to go astern of her, and that that course would, without question, have been adopted under the circumstances by a person of ordinary skill and judgment, then the question would be fairly presented whether the Jamaica under such circumstances should be charged with the full responsibility. Previous errors, indeed, not directly but only remotely connected with the collision, are deemed immaterial when there is ample time and opportunity to correct these faults, and when the collision, notwithstanding such faults, might have been avoided by the use of ordinary skill and judgment. This may, perhaps, be accepted as a substantially correct statement of the rule of law. *The Dexter*, 23 Wall. 69, 76. The only difficulty lies in its application. Substantially the same rule has frequently been applied in this court in cases of vessels navigating in parts of the river forbidden by statute. *The E. A. Packer*, 20 Fed. Rep. 329; *The Maryland*, 19 Fed. Rep. 556, and cases there cited. See, also, *The Eliza & Abby*, Blatchf. & H. 435, 442; *The Union*, 2 Biss. 18. The same rule has recently received a very interesting discussion in the house of lords in the case of *Cayzer* v. *Carbon Co.* L. R. 9 App. Cas. 873, where the same result is arrived at, reversing the decision of the court of appeal. But in all these cases the facts were clear, and the proximate cause of the collision and its remote cause were separated by a very clear and broad line of division. But where the earlier cause and the later cause are both proximate and direct,

both vessels are liable; for it is unreasonable that a fault in one vessel tending directly to a specific collision should go blameless, merely because it was the first fault, or merely because the other vessel did not do all that she might have done to avert the consequences of the other's fault. In such cases both are deemed in fault, and the damages are divided. *The Sapphire*, 11 Wall. 164; *The A. Denike*, 3 Cliff. 117, 122; *The Commerce*, 3 W. Rob. 287; *The Sunnyside*, 91 U. S. 208, 214–223; *The Pegasus*, 19 FED. REP. 46.

Unfortunately, however, the evidence of the different parties bearing upon the application of this principle in this case is in irreconcilable conflict. If the evidence on the part of the Jamaica is regarded as approximately true, her situation when the exchange of contrary whistles took place was a situation *in extremis*, in which the collision could not possibly have been avoided by her through any attempt to stop or go astern.

In applying the above rule in particular cases, whenever it is sought to relieve a vessel from the consequences of a previous fault tending to produce a collision, the burden of proof is certainly upon her. She must satisfy the court beyond any reasonable doubt, not merely that the collision, notwithstanding the previous fault, might possibly have been avoided by the other vessel, but that the mode of avoiding it suggested was timely, and would have been adopted, under the particular circumstances, by a pilot of ordinary skill and judgment. The rule certainly has no application to a situation *in extremis;* nor can it be justly applied where the situation is such, all the circumstances being considered, that any reasonable doubt might exist as to the best course to be pursued on the part of those in charge of the other vessel. In short, all situations in which the final failure to avoid the collision comes within the limits of excusable error of judgment by persons of ordinary skill and coolness, must be excluded from the application of this rule. A vessel which has brought another, either wholly or partly by her own fault, into a dangerous situation, must bear the responsibility of a mere error of judgment made subsequently in the endeavors to avoid a collision. This is a familiar rule applied to errors *in extremis*. *The Genesee Chief*, 12 How. 461; *The Favorita*, 18 Wall. 603; *The Elizabeth Jones*, 5 Sup. Ct. Rep. 468; S. C. 112 U. S. 514.

At the time of the last contrary signals, the evidence on the part of the Nereus is to the effect that she was off North Second street, about 850 feet from shore; and that the Jamaica was about 150 feet out from her pier, and about the same distance above it, and about 500 feet distant from the Nereus, and heading for the latter's pilot-house. According to the Jamaica's evidence she was at the time of these two whistles about one-third of the way across the river; and within from 100 to 200 feet of the line of the Nereus' course, heading nearly across the river. There are such difficulties in reconciling the relative situation of the two boats, as alleged by the Nereus,

with the other testimony of her own witnesses, as well as such improbabilities attending it, that I am obliged to reject it as altogether mistaken. If the relative situation of the two boats was such as the Nereus alleges, it would, moreover, seem almost incredible that the pilot of the Jamaica, on hearing the signal of one whistle from the Nereus, should not have acquiesced, replied with one, and immediately ported his wheel. In the situation alleged that alone would probably have easily carried the Jamaica astern of the Nereus; if not, backing, in addition, would most certainly have done so. This mode of avoiding danger was so evident, and the risk of the opposite course so great, that the pilot of the Jamaica, with his long experience, is fairly entitled to the benefit of the *prima facie* assumption that he would not have persisted upon a course evidently hazardous upon contrary signals when there were so simple means of escape.

It must be borne in mind that the time that elapsed between the collision and the time when the Jamaica gave her first whistle as she was passing the end of her pier did not probably exceed one minute; for from that point to the place of the collision, about 850 feet off North Second street, she traversed, even in her winding path, not exceeding 900 feet. The tide during this time would set her up 300 feet; and, very shortly after starting at the full speed of her engines, she had acquired her full headway of from eight to nine knots. From the other testimony it is evident, also, that the first whistles between the Nereus and the Jamaica were not more than a quarter of a minute after the signal given by the Nereus to the George Law. The signal to the George Law was given just as the Nereus had cleared the Tenth-street buoy, which is opposite North Sixth street, and in range between that and Tenth street, New York, and is upwards of 1,000 feet above North Second street, the place of collision. If the second whistle to the Jamaica was given when the latter was but 150 feet above her pier, it must have been given in less than half a minute after her first whistle, and the Nereus could not have then reached North Second street where her captain alleges she then was, unless she had been going during this half minute at the rate of 12 knots, which was at least double her actual speed by land. Her captain testifies that he slowed as he passed the Tenth-street reef, on signaling the George Law, and was previously going at the rate of about five and one-half knots by land. The pilot of the George Law testifies that when the Nereus whistled to the Jamaica, the Nereus was "a little below Tenth street." This would place her bows certainly above North Fourth street when she first signaled to the Jamaica; and during the minute that followed, until the collision, she must have traversed upwards of 400 feet. The position thus assigned her is, I think, indirectly confirmed by the testimony of the Tenth-street pilot, who testified that she was in the range of North Sixth street when the whistles of the Jamaica were given. I think he is mistaken as to the whistle he refers to, and that it was the whistle given

to the George Law, and not that given to the Jamaica, that was then given. Thus interpreted, it certainly confirms the other testimony to the effect I have stated.

But not only is it impossible that the Nereus could have got down to North Second street by the time the Jamaica was some 200 feet only from her pier, but in that situation, and with the previous understanding, to which the pilot of the Nereus testifies, that the Jamaica was going astern of him under an understood signal of one whistle, there was no reason for the Nereus to repeat her previous signal, as there would then be no reason to suppose the Jamaica would not go astern of him in accordance with that supposed understanding. Again, he says that when he gave two whistles to the Commodore,—the first heard by the Jamaica,—he shut off steam at the same time. This would be an unaccountable order, so far as I can understand, in that situation. Finally, he testifies that the order to reverse the engines was given when the Jamaica's two whistles were heard, his boat being then "at a dead stop," and that his engine backed from one to one and a half minutes before the collision. The engineer estimates that he got about 45 revolutions backward, her previous speed forward being 56 revolutions to the minute. All these statements I am obliged to deem mistaken, because incompatible with the other testimony concerning the relative situations of the Nereus and the George Law, as to which there is less liability to mistake in the testimony. The distance even between the George Law and the Nereus, as the former passed, is probably estimated by Capt. Lockwood too small when he states it at 500 or 600 feet. If the Nereus was then just passing, or had just passed, the Tenth-street buoy, as Capt. Coleman states, and as is confirmed by the Tenth-street pilot, then the bows of the Nereus must have been at least 750 feet distant from the George Law. The Jamaica passed nearly in the track of the George Law; that is, probably not over 100 feet above her, and certainly not more than one and one-fourth or one and one-half minutes behind her. The pilot of the Jamaica says that when he started from his slip, the George Law was about one-third of the way across the river. The rest of the testimony agrees with this, as a rough estimate. Had the Nereus been slowed, stopped, and backed in any way approximating that testified to on her part, prior to the collision, she could not have traversed the distance that separated her from the George Law in the short interval up to the time when the Jamaica passed a little above the George Law's track.

On the other hand, supposing the Jamaica to have crossed the line of the Nereus 100 feet higher up the river than the path of the George Law, the Nereus must have come down the river from 400 to 600 feet to reach the point of collision; and assuming that the Nereus slowed as she passed the Tenth-street buoy and whistled to the George Law, as her pilot testifies, in order to have reached the point of collision at all, she could not have commenced backing until a very few

seconds before the collision. It may be assumed as natural and probable that, upon the contrary signal of two whistles given by the Jamaica, and the several toots signifying danger that immediately followed, she did begin to back; and as this, for the reason above stated, could not have been but a few seconds before the collision, it follows that the Jamaica must have been far more nearly in the situation alleged by her own witnesses than in that testified to by the witnesses of the Nereus. This is further confirmed by the nature and extent of the damage done both to the Jamaica and to the Nereus. It is difficult to believe that so serious damage would have been inflicted on both if the Jamaica was merely drifting up with the tide, and if, as the Nereus alleges, she herself was also backing by land. The injuries were such as would seem only probable if the Nereus still had a considerable forward motion by land. In referring to these various details in which I think the testimony on the part of the Nereus is mistaken, I design no reflections upon the general integrity of her witnesses. The time and space within which the occurrence took place were so small, and the changes so rapid, that these mistakes are easily accounted for by erroneous recollection as to the sequence of events merely, and as to the precise order of similar occurrences.

The situation of the two vessels at the time of the contrary whistles, as stated by the witnesses on the part of the Jamaica, while not agreeing in minute particulars, are, nevertheless, in the main consistent. If the Jamaica was only from 100 to 300 feet to the eastward of the line of the course of the Nereus, and the Nereus was under considerable headway, as their witnesses assert, and as I think the other evidence justifies, then there was no chance of escaping a collision at the exchange of contrary whistles, except possibly by the Nereus' starboarding. Had this been done, as I think the Nereus could not have been then backing, her bows would have swung to port, and might possibly have escaped the Jamaica.

The testimony of the witness Lockwood, the pilot of the George Law, is such as to suggest great doubt in my mind whether the contrary signals he refers to were really the first or the last. He speaks of the contrary signals attracting his attention. Now, the first exchange of whistles between the Nereus and the Jamaica were really contrary whistles. He was as near the vessels then as he was afterwards, and no reason appears why he should not have noticed those whistles as well as the latter contrary ones. He says these two whistles from the Jamaica were just as she got out of her slip, and that is about where she was when her first two whistles were given to the Nereus, and those first two would have been audible to him. In interviews had with him at the time, and in his recollection afterwards, he was in evident perplexity in regard to the whistles heard. It is pretty clear either that he did not hear both sets of contrary whistles, or that he got them in some way confounded in his recollection. He considered that the Jamaica ought to have stopped and

backed at the time he heard the contrary whistles. But this judgment was based upon the position of the Jamaica at that time in his mind as being near to her pier. That was her situation at her own first two whistles. On account of this evident confusion, and the perplexity which marks his testimony, as well as his readiness to accede to the statement made by the officers of the Jamaica's line at the time of the transaction, no conclusive weight can be given to his testimony.

For these reasons I do not think the Nereus has sustained the burden of proof that is upon her, to absolve herself from her previous fault by showing that her subsequent signal of one whistle was given in sufficient time to charge the whole blame for not complying with it upon the Jamaica. But the previous fault of the Jamaica being also clear, the damages must be divided between them.