THE JOHN S. DARCY, etc.[1]

THE ISAAC L. FISHER, etc.

CONOVER v. THE JOHN 'S. DARCY, etc.

NEW YORK, L. E. & W. R. CO. v. THE ISAAC L. FISHER, etc.

(*District Court, S. D. New York.* January 5, 1887.)

1. COLLISION—FERRY-BOATS AND SLIPS—RULES OF NAVIGATION—DANGEROUS START A FAULT. ·

A tug, in navigating about the mouth of a ferry slip which a ferry-boat is approaching, is chargeable with notice of the ordinary course of the ferry-boat in making her slip, and the necessary turns and changes of heading, under the circumstances of the tide, in order to enable her to make her landing in the usual manner. The rules of navigation must be applied in reference to such known and necessary changes of the ferry-boat's course, and, when a boat cannot start from the dock without risk of collision, she is bound to wait.

2. SAME—TUG AND TOW—RULE 19—RULE 24—DELAY IN REVERSING.

The ferry-boat J. S. D., of the Pavonia ferry, was coming up the North river, with a strong flood-tide, to make her landing at Twenty-third street. While she was still heading up river, a few streets below, and before she had made her usual turn to enter the slip in a diagonal direction, the steam-tug I. L. F., having taken a tow along-side at the Twenty-fourth street dock, headed straight down' river, close to the piers, so as to go down inside of the ferry-boat; each being, when the tug started, on the other's starboard hand. The J. S. D. pursued her usual course in rounding into her slip, and struck the tow of the I. L. F. a few feet from the outer end of the lower part of the slip. *Held,* that the J. S. D. was not bound to continue up river, starboard to starboard, but was entitled to make her usual turn, at the proper time, in order to effect her entrance into the slip in her usual manner; that the tug was chargeable with notice of the necessary change in her course, which change would make her, in effect, a crossing vessel, which the tug was bound by old rule 19 to avoid; and that the tug was therefore in fault for not going out into the river, as she might have done, to keep out of the ferry-boat's way; or, if that was not safe, she was bound not to start till all danger from the ferry-boat was past; that she was also in fault for running unnecessarily close to the piers, and across the ferry-boat's necessary course. The ferry-boat was also held in fault, because, seeing the course of the tug persisted in until the latter could no longer avoid a collision, the ferry-boat did not promptly stop, as she might have done, and thereby have averted any injury.

A few minutes after 7 o'clock in the evening of December 4, 1875, as the steam ferry-boat John S. Darcy, coming from the Pavonia ferry, Jersey City, with a strong flood-tide, was about ' entering her slip at Twenty-third street, North river, she came into collision with the tug-boat I. L. Fisher, striking with her bows the starboard side of the tug, a little aft of the engines, doing both vessels some damage, for which the above cross-libels were filed. The entire slip from Twenty-second to Twenty-fourth street is about 536 feet wide by 650 feet deep. The two ferry landings at the head of the slip are a little below the middle of the slip, and occupy about 180 feet of its width. The ferry-boats also had

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

the exclusive use of the clear water, about 108 feet in width, between the Twenty-second street pier and the lower ferry rack. Between the northerly ferry rack and the southerly side of Twenty-fourth street pier there is clear water, about 230 feet wide. The Twenty-fourth street pier extends from the bulk-head about 650 feet into the river, being about 100 feet longer than the Twenty-second street pier, and over 300 feet longer than the racks forming the ferry slip proper. There was thus a large area of clear water within the slips besides the ferry landings. On the night in question the Fisher had gone into the slip to pick up a barge lying on the southerly side of Twenty-fourth street pier, for the purpose of towing her down the river. The tug approached the barge bow to bow, and, having fastened to the barge's stem, backed until the tug was about half way beyond the corner of the Twenty-fourth street pier, drawing the barge along at the same time. The stern of the tug being then allowed to swing up river with the tide till her head was turned nearly down, the tug moved ahead, and, fastening the barge upon her port side, very speedily headed directly down river, and proceeded straight down; being not further out, at most, than 50 feet from the line of the end of the Twenty-second street pier. Shortly before the collision she put her engines full speed ahead, hoping to pass the course of the ferry-boat, but was unsuccessful in the attempt. The ferry-boat, shortly before the collision, reversed full speed, and at the time of the collision was nearly, but not quite, stopped.

*Wilcox, Adams & Macklin*, for the Darcy.

*E. D. McCarthy*, for the Fisher.

BROWN, J. Upon the evidence, I must find that the place of collision was less than 100 feet outside of the end of the Twenty-second street pier, nearly abreast of that pier, and in the usual track of the ferry-boats of that line in entering the Twenty-third street slip, in a strong flood-tide. I must further find that the pilot of each of these boats saw the other in ample time to avoid the collision, and understood perfectly the movements, course, and intention of the other. The pilot of the ferry-boat, when about opposite Seventeenth street, and one-third of the distance across the river, and being then nearly half a mile distant from the tug, saw the latter as she was backing out along the Twenty-fourth street pier, and knew from her lights that she had a tow in charge. He gave her a signal of one whistle, but got no answer. Soon after he saw her moving straight down river, across the mouth of his slip, and gave her another signal of one whistle, to which he received a reply of two blasts from the tug. He then sounded an alarm whistle, and reversed his engines full speed, but not in time to avoid collision.

It is clear from the evidence that the whistles above referred to, and the reversal of the engines, could not have been given so rapidly as might be inferred from the testimony of the ferry-boat's witnesses. The ferry-boat was moving more slowly than usual, and, with the flood-tide, could not have been going more than at the rate of eight knots by land; so that it must have been at least four minutes from the time of her first whistle

to the collision. The ferry-boat was seen from the tug at about the same time, or perhaps a little after, her first signal was given, although the tug's witnesses state that they did not then notice that she was a ferry-boat. If they did not notice this, it was their own fault, since the lights indicated it. But it was certainly known to be a ferry-boat bound for that slip when the second signal was given, and when the tug's contrary signal of two blasts was given in reply. If these opposite signals were not exchanged until within a distance of 300 or 500 feet from the Twenty-second street pier, there was clearly negligence on the part of both in not giving or repeating the signals earlier.

1. The tug was familiar with the slip, and with the movements of the ferry-boats; and she is chargeable with knowledge of the usual course of such boats in approaching the slip in the flood-tide. When the pilot of the tug first saw the Darcy, he says that her green light only was visible, and that she was one-third of a mile distant, i. e., much below him in the river. Shortly before the collision, as he says, she changed her heading so as to show her red light. The ferry-boat's witnesses deny any change of course, except a port wheel just before the collision, designed, it is said, to assist in avoiding the tug. The evidence shows that the ordinary course from Pavonia ferry, which is two statute miles below Twenty-third street, is to head nearly up river, after getting out into the stream, and then turn towards the New York shore, when about opposite Seventeenth street; with a still further turn towards the shore when near the Twenty-second street pier, so as to pass within from 10 to 20 feet of the upper corner of that pier, and at an angle of about four points with the line of the stream. Entering the slip in this manner, the flood-tide sweeps the stern upwards, as the boat passes in, so that the landing is thus most easily and safely made. The changes in the lights seen, as sworn to by the witnesses of the tug, correspond with the changes that navigation in the usual course would show; and I must find, therefore, that the course of the ferry-boat on this occasion was the usual course, and with the usual changes, notwithstanding the testimony, in general terms, that she kept a straight course from the Pavonia ferry to the Twenty-second street pier. And I am the more inclined to this from the fact that no straight heading for the Twenty-second street pier, with a strong flood-tide, could possibly have brought the Darcy there, but would have carried her far up the river, before she had reached the New York shore, unless her course by compass was kept constantly changing, so as to head for Twenty-second street pier, under a constant slightly port wheel; and that would cause the same changes of lights testified to by the tug, and thus amount to the same practical result.

It is claimed on the part of the tug that the ferry-boat, from the fact of showing her green light when half a mile distant, was bound to keep that relative position to the tug until the tug had passed her; and, the lights being green to green, the tug had a right to pass her starboard to starboard. This claim cannot be sustained in the special circumstances of this case. It would subject ferry-boats known to be approaching their

slips to precisely the same rule as vessels navigating the open sea. This is neither reasonable, nor in accordance with the decisions or the rules. The case of ferry-boats approaching their slips in a strong tide comes plainly within the exceptions provided for in the twenty-fourth rule, having reference to the special circumstances of the case. The "course" of a ferry-boat is that which she is obliged, from necessity, to hold in order to effect an entrance into her slip, with all the changes and turns which that course necessarily involves. The case is similar to the situation of a vessel navigating a winding stream, whose "course" is of necessity the channel of the river, with all its changes, not a straight course by compass. It is the same also with a vessel beating; another crossing her course must allow for her necessary change of course on running out her tack and coming about. *The Velocity*, L. R. 3 P. C. 44; *The Ranger*, L. R. 4 P. C. 519; *The Wm. H. Beaman*, 18 Fed. Rep. 334; *The Isle of Pines*, 24 Fed. Rep. 498.

No small skill is necessary to avoid accident in navigation under such circumstances. The necessities of the case, for the protection of human lives, long since led Judge BETTS to declare in this court that it was "indispensable that the exit from and entrance into the ferry slips should not be checked or embarrassed by the presence of other vessels passing close to them." *The Relief*, Olcott, 104, 109. The duty of vessels to keep away, when they can, from the known path of ferry-boats, close to the slips, has since been repeatedly affirmed, and, so far as I am aware, has never been relaxed. Any voluntary disregard of this obligation has since been uniformly held to be a fault, such, even, as no usage can validate or justify. *The Favorita*, 8 Blatchf. 539, 541; *The John Cooker*, 10 Ben. 488; *The Columbia*, 8 Fed. Rep. 718; *The Monticello*, 15 Fed. Rep. 476; *McFarland* v. *Selby*, 17 Fed. Rep. 256.

In the case of *The Favorita, supra*, WOODRUFF, circuit judge, affirms this obligation of other boats towards ferry-boats upon reasons of ordinary prudence, and without reference to the state statutes applicable to the East river; and he there held the Favorita "bound to conform to the exigencies of that situation, and make her advance such as not to imperil other vessels pursuing their ordinary, accustomed, well-known business, with which those in the management of the Favorita must be taken to have been familiar." This seems to me precisely applicable to the tug in the present case. There was no obstruction to prevent the tug's going out into her proper place in the stream. In hugging the shore for the sake of the less head-tide, she voluntarily chose the risk of being held in fault, if accident arose.

If there had been anything, however, in the way that prevented the tug's going out into the river, it would have been her duty to wait till the Darcy had come into her slip, rather than to start across the Darcy's known course, at a moment when nothing short of immediate measures to avert collision could possibly avoid one. The tug was safe where she was. If she did not wish to go out into the river, and head the strong flood, she was bound to wait; because, the Darcy's course into the slip being known, the tug's starting across the Darcy's course was dangerous and

unjustifiable. *The Belleville*, Newb. Adm. 497, 500; *The Nereus*, 23 Fed. Rep. 448, 456. The ferry-boat had a right to follow her usual course in rounding into her slip, and the tug was bound to navigate in reference to it. If the Darcy showed her green light at first, as I think she did, it was necessary for her to turn enough to show her red light, in order to make her slip. The pilot of the tug well knew this fact, and was bound to foresee the ferry-boat's necessary turn, and to act accordingly. The tug had the Darcy on her own starboard hand, and the Darcy, being under the necessity of turning in order to make her slip, was, in effect, in the situation of a crossing vessel, although, when first seen, her heading was not crossing. By old rule 19, therefore, the tug was the one bound to keep out of the way, and not the ferry-boat; and in hooking up, instead of backing, when their courses were crossing, the tug took the risk of being held in fault, if her maneuver was not successful. *The Khedive*, 5 App. Cas. 876; *The Frisia*, 27 Fed. Rep. 480, 24 Fed. Rep. 495; *The Galileo*, 28 Fed. Rep. 469, 24 Fed. Rep. 391.

For these several reasons I must hold the tug to blame.

2. As respects the ferry-boat, the case of *The Fanwood*, 28 Fed. Rep. 373, 376, affirmed in the circuit, is so entirely analogous that little discussion is necessary. Here, as in that case, the position, the course, and the intent of the tug were perfectly apparent, and were understood by the ferry-boat, in ample time to have avoided her. If the ferry-boat had a right to expect that the tug would go out into the stream, the fact that the tug was taking the contrary course was apparent, and it was clear that she was persisting in this course when she could no longer avoid the ferry-boat by any change that she could make, while the ferry-boat could still, by stopping in time, avoid collision. The proof shows that the Darcy, at her moderate speed, would have stopped dead in the water in going a little over two lengths. The considerable time that elapsed after the Darcy's first whistle leaves no doubt in my mind that the Darcy might have stopped completely after immediate danger of collision was manifest. She was not justified in running upon the tug because the tug did not perform her duty; she should have stopped in time, under old rule 21.

The damages and costs must be divided.