THE EDDIE GARRISON and THE SOUTH BROOKLYN.

SHERRIDAN v. THE EDDIE GARRISON and THE SOUTH BROOKLYN.

(District Court, S. D. New York.   January 7, 1895.)

COLLISION—TUG AND FERRYBOAT—PREMATURE START — THWARTING BY STOPPING.

The ferryboat S. B. left her slip to cross the East river a few moments only after the ferryboat A. left the adjoining slip, so that the boats were lapping each other as they went out. The ordinary course of the two required the S. B. to fall back and pass under the stern of the A.; this was hastened by the presence of a sail lighter going down the river, so that the S. B. was compelled to stop or slow down, when a little out of her slip directly in the path of the tug E. G., with her tow, coming down on the ferryboat's port hand. On starting, the S. B. gave the usual starting signal, which was heard by the E. G. The latter did not stop until the S. B. was part way out of the slip, and collision ensued about 300 feet

from the shore: *Held*, (1) that the ferryboat was partly to blame for the collision, for starting out abreast of the A. and under circumstances which would oblige her to stop her speed soon after leaving the slip, and would mislead the tug; (2) that the tug was to blame for not stopping on hearing the starting whistle of the S. B., and for undertaking to pass her too closely.

In Admiralty. Collision.

Carpenter & Park, for libelant.
Hyland & Zabriskie, for the Garrison.
Burrill, Zabriskie & Burrill, for the South Brooklyn.

BROWN, District Judge. At about 7 o'clock a. m. of August 16, 1894, a few moments after the ferryboat South Brooklyn left her slip between piers 2 and 3 East river, bound for South Brooklyn, by way of Buttermilk channel, she came in collision with two canalboats which were in tow alongside of the steam tug Eddie Garrison, coming down out of the East river. The bows of the libelant's canalboat, which was the outer boat on the port side, struck the ferryboat's port quarter about 25 feet from her stern, and suffered considerable damage, to recover which the above libel was filed.

The tug had taken the two canalboats from the slip between piers 6 and 7 East river upon her port side, had swung around so as to be headed down river when about 400 feet, as her witnesses say, off from the docks, and then proceeded slowly down river against the flood tide. The pilot, when about off pier 4, saw the Brooklyn coming out of her slip, about half way out, and at the same time got a signal from her of one whistle. He had previously, when off pier 5, heard from her a signal of one whistle before seeing her, which he understood to be a signal that she was about to come out of the slip in accordance with the rules governing the departure of ferryboats. He answered the second signal with one whistle, and claims that he immediately stopped and backed; that collision ensued because the Brooklyn herself, on going out of her slip, did not continue at her regular speed, but stopped, and a little before collision, ported her wheel, so that with the drift in the tide, and the swing of her stern under a port wheel on starting up a few seconds before collision, the stern was swung against the canalboat in the manner above stated.

On the part of the ferryboat it appears that just prior to the departure of the South Brooklyn, the ferryboat Atlantic, which has a berth next to the South Brooklyn to the west, had started for her destination at the South ferry, Brooklyn; that her usual course was across the course of the South Brooklyn, towards Buttermilk channel, and that the Atlantic diverged to port and across the course of the Brooklyn somewhat sooner than she ordinarily would do, in consequence of a lighter which was coming down further out in the stream, which required the Atlantic to port somewhat in order to go astern of her. The Atlantic did not check her speed, which was equal to that of the South Brooklyn; but the South Brooklyn was so close to the Atlantic that she was compelled to slacken, though

according to her own testimony she did not stop her paddle wheels; and her stop, or slackened speed, lasted probably not over 15 or 20 seconds, when she went on at full speed as before.

The pilot of the South Brooklyn testified that as he went out of his slip he was completely astern of the Atlantic, and that there was 25 feet of clear water between his bow and the Atlantic's stern. It is manifest, however, that he is mistaken in this testimony, not only from the direct testimony of the Atlantic's pilot, and other witnesses, that the South Brooklyn was lapping his port quarter as he went out; but from the further consideration that the Atlantic, if completely ahead of the South Brooklyn, when the latter left her slip, must have already acquired a higher speed, and could not have embarrassed the South Brooklyn afterwards by her course. The collision was about off pier 3, and the distance from shore I find to have been about 300 feet. That it was not less is shown, I think, not merely by the tug's witnesses, but also by the fact that the Brinckerhoff, coming around the Battery from the North river into the East river with a small sloop in tow on a hawser, passed under the stern of the South Brooklyn as she came out of her slip, and at the time of the collision had reached pier 5, East river. During this interval, considering the clear water that must have been between the South Brooklyn and pier 3 at the time when the Brinckerhoff passed astern of her, it seems to me impossible that the stern of the South Brooklyn should have been less than about 300 feet from shore at the time of collision, when the Brinckerhoff had reached pier 5.

Upon the above facts I think both vessels must be held in fault. It was not prudent, nor justifiable navigation for the South Brooklyn to start out of her slip lapping the Atlantic, which was going ahead of her and close alongside of her, when the ordinary course of the Atlantic would require her to cross the bows of the South Brooklyn; and particularly so, when the lighter visibly going down the river would compel the Atlantic to turn to port sooner than usual, as the South Brooklyn ought to have perceived. The ordinary course of the Brooklyn was to pass under the stern of the Atlantic. Reasonable prudence, and the spirit, if not the exact letter of the state law, which forbids vessels to pass within 60 feet of each other, required her to wait until the Atlantic was sufficiently clear. Moreover, by going out prematurely, as she did, she presently had to stop or slow, when directly in front of other vessels coming down river, and could not "keep her course and speed"; and that was directly calculated to mislead other vessels, and to bring on collision by thwarting their expectations; because they could not anticipate such a stop. The Britannia, 153 U. S. 130, 141–143, 14 Sup. Ct. 795; The Nutmeg State, 62 Fed. 847. It was this stop that was the immediate cause of this collision. The tug would not naturally suppose that the ferryboat would stop in the stream or materially check her speed a few moments after starting when directly in front of the tug; and the tug, no doubt, calculated on passing safely astern of the South Brooklyn. The tug was not in such a position as to enable

her pilot to perceive and appreciate the precise navigation necessary for the South Brooklyn; so that I cannot hold the tug chargeable with knowledge that the South Brooklyn would be obliged to stop as she did; while the South Brooklyn, on the other hand, was in position perfectly to understand that necessity before she started.

It is these two circumstances, the close proximity of the Atlantic, and her own inability to continue her course, making it sufficiently evident to the South Brooklyn that by her premature start she would be obliged to stop in the path of other vessels just outside the slip, and thus mislead them, which make this case wholly different from that of The Breakwater, 39 Fed. 511, affirmed in 15 Sup. Ct. 99, where no such embarrassment or tendency to mislead existed.

I must find the South Brooklyn, therefore, to blame; because her imprudent navigation manifestly contributed to the collision. See The Boston, Olcott, 407, 414, Fed. Cas. No. 1,672; Randolph v. The United States, Newb. 497, 500, Fed. Cas. No. 11,562; The Electra, 1 Ben. 282, Fed. Cas. No. 4,337; The Nereus, 23 Fed. 448, 456; The John S. Darcy, 29 Fed. 644.

2. The tug was navigating unlawfully too near the shore. She claims that she did all she could to avoid collision after the signals of one whistle were exchanged, and that it was ineffectual only because the ferryboat stopped and then swung her stern to port. This tug, as in the Intrepid, 48 Fed. 327, and The Brooklyn, 62 Fed. 759, had the ferryboat on her starboard hand, and was bound to keep out of the way.

I am not quite satisfied as to the tug's immediate reversal after the exchange of signals, since she would naturally stop in the water very quickly when moving slowly against a strong tide. But aside from that consideration, I must hold the tug in fault not only for navigating too near the mouth of the ferry slips, as above stated, but for not stopping her engines when off pier 5, at the time when the ferryboat's first starting signal was heard and understood. She was then only 500 or 600 feet at most above the line of the ferryboat's course, which would naturally swing towards her in the strong flood. The tug was bound to allow a reasonable margin for the contingencies of navigation,—a rule continually applied in the interest of life and property. The Carroll, 8 Wall. 302; The Benefactor, 14 Blatchf. 254, Fed. Cas. No. 1,298; The Cyclops, 45 Fed. 124, and cases there cited; The Beta, 40 Fed. 899, and cases there cited.

If instead of observing this obligation, close shaving is indulged in, it must be at the risk of being held liable for contributory negligence, if accident ensues. The damages are, therefore, divided. Decree for the libelant against both vessels.