## THE ARTHUR M. PALMER.

(District Court, E. D. New York. February 5, 1902.)

1. COLLISION—STEAM VESSELS CROSSING—AGREEMENT BY SIGNAL.

A vessel which assents by signal that another shall cross her bows cannot urge the attempted maneuver as a fault, though it results in a collision.

2. SAME—FAILURE TO KEEP LOOKOUT.

A steam vessel which did not have a proper lookout, as required by the rules, cannot be exonerated by the court from fault for a collision, unless it appears that she could not possibly have avoided the accident, even if the lookout had been in his place.[1]

3. SAME—PASSING TOO CLOSE TO PIERS IN HUDSON RIVER—FAILURE TO MAINTAIN LOOKOUT.

A tug with a large and long car float on her side was passing up the west side of the Hudson river, unnecessarily near the ends of the piers, which were only about 100 feet distant, when a collision occurred be-

[1] See Collision, vol. 10, Cent. Dig. § 148.

tween the float and another tug, which came out from a slip behind a pier which obstructed the view. The latter had no lookout except the pilot, who was in the wheel house, 30 feet from the stem, and the tug, with the tow, was not seen by him until he passed beyond the end of the pier. At that time he was in close quarters, with the tug and tow only about 150 feet away, and his attempt to cross their bows as agreed by signal, while perhaps the only maneuver then practicable, resulted in the collision. *Held*, that the presence of a lookout in the proper position might have enabled such tug to avert the collision, and that both tugs were in fault.

In Admiralty. Suit for collision.

Benedict & Benedict, for libelant.

Wing, Putnam & Burlingham, for claimant.

THOMAS, District Judge. On the 8th day of April, 1901, at about 4:50 p. m., the tug A. C. Cheney, passing from the slip on the north side of the Delaware & Hudson coal pier, on the west side of the Hudson river, collided with the port corner of a heavily loaded car float, projecting some 75 feet from the starboard bow of the tug Palmer. The Cheney was about 116 feet long, the Palmer about 95 feet in length by 22½ feet beam, and the float was 175 feet in length by some 30 feet in width. The Cheney had been coaling at the pier, about 450 feet from the outward end thereof, and upon starting outward, under one bell, she blew a long whistle for the space of 10 seconds. The pier is very much closed in, so that those in charge of the Cheney could not see the vessels approaching from down the river, and at a point 150 feet inward from the face of the pier it is substantially closed. At a point about 417 feet east of the face of the pier are shad stakes, and it is customary for steamships coming up the river, bound from and to points on the western shore, to keep to the west of such line of stakes. The Palmer started from Morris Canal basin, and made her way, at the rate of three or four miles per hour, against a strong ebb tide. She was bound for the West Shore dock, which is directly above the West Shore ferry, and that is immediately above the slip from which the Cheney was coming.

From the great mass of conflicting evidence, one salient fact is easily selected, and becomes a starting point for further discussion, and that is that the collision occurred about on a line with the north side of the pier, in any case not more than 25 feet northward thereof. Several of the important witnesses on each side put it about on the line. Willmot, assistant foreman for the Delaware & Hudson Coal Company, stood on the end of the pier, where he had the best opportunity to view the situation, and he placed the point of collision about 12 feet to the northward of the north line of the pier. It is also undisputed that four coal boats lay on the north side of the pier, approaching to within 5 or 6 feet of the end thereof. Each boat was 92 feet long and 14 feet wide, so that they covered a lateral space of 56 feet. The evidence of the captain and pilot of the Cheney is to the effect that in coming out of the slip, which was bounded on the north by an ice breaker, about 150 feet to 100 feet from the north side of the pier, the Cheney kept to the north of the pier about 75 feet, and, considering the space occupied by the coal boats, such a distance seems to have

been necessary. The captain and the pilot of the Cheney place the port side of the Palmer's float 100 feet off from the face of the pier. The pilot house of the Cheney was 30 feet aft of the stem, and the pilot states that he did not see the Palmer until his pilot house was out from under the pier, and that at that point he gave two short whistles, to which the Palmer did not respond, although the evidence of the Palmer is that she did respond immediately to such whistles. In any case, the Cheney proceeded to cross the bow of the Palmer's float, which was on the Cheney's starboard hand, with the result that the port corner of the bow struck the Cheney about amidships. Hence it appears that the Cheney amidships, while traveling about 100 feet, the distance of the float, plus some 28 feet, the distance the point of contact on the Cheney was within the pier, in all 128 feet, went about 75 feet southward, or at least 1 foot southward to 2 feet eastward, carried down the stream by the force of the tide. The pilot of the Cheney states that the float, at the time the two whistles were blown, was not more than 150 feet south of the Cheney's projected course. Hence the Cheney, in going 128 feet, went down nearly half the distance the courses of the vessels were apart. If no excuse for this shall appear, the Cheney should be found in fault for this maneuver. It is obvious, and should have been apparent to the navigators of the Cheney, that this attempt to pass across the bow of the float was absolutely impracticable, and it appears to the court to have been justified by no safe rule of navigation, if there was feasible alternative.

But it is alleged by the libelant that this attempt was the only maneuver possible for the Cheney, for it is urged, and the contention is supported by the preponderance of evidence, that there was not room for the Cheney to break around the canal boats and the end of the pier, and go under the stern of the float, and it is alleged that, had she attempted to reverse and back, the tide would have swept her against the coal boats, or the end of the pier, or that her bow would have struck the Palmer or the float. It is undoubted that, if the Palmer and her float were not farther off from the end of the pier than the distances testified by the libelant's witnesses, the Cheney was in very close quarters; and while it seems to the court, knowing what did happen and the necessity of its happening, that an attempt to reverse and back could not have been more dangerous, yet the preponderance of evidence does not show that the course pursued by the Cheney indicated such lack of judgment in her extremity as to demand condemnation, provided that she was not in other respects negligent, and provided, also, that the Palmer was not farther off than heretofore indicated. However, the contention of the Palmer is that she was just nicely clearing, by 10 or 12 feet, the shad stakes, 417 feet to the eastward of the pier. While the quantity of the libelant's evidence is greatly disproportioned to its quality, the claimant's evidence is not more acceptable in its quality, and its quantity is comparatively diminutive. The libelant produces some 14 or more witnesses, who testify of the distance that the float was out, while the claimant supports his contention by the evidence of some four witnesses, all of them in the claimant's employ. It is recalled that all the witnesses for the libelant were in the employ of the libelant, except Willmot, who

was the assistant foreman of the Delaware & Hudson coal dock, and he had no relation to the libelant other than that as an employé of the company that was furnishing the coaling facilities.

It would not be a fair judicial conclusion to disregard the preponderance of evidence given by the libelant, and hence it is decided that the float was not in her proper position in the channel. Moreover, as the Palmer immediately assented to the steering signals of the Cheney, she may not complain if the indicated maneuver was attempted, although the Palmer's evidence shows that the signals were not given until the Cheney was so far out that the maneuver could not, even in the opinion of the pilot of the Palmer, be safely executed; for, whatever its value may be, the fact should be kept in mind that it appears from the evidence of the libelant that she gave a long whistle and received no response, and her claim is that she had a right to consider that there were no vessels approaching in the channel. Those connected with the Palmer say that they heard no long whistle, although it appears from their evidence that whistles should have been heard, if given.

Up to this point there would be no difficulty in finding that the fault must rest alone with the Palmer, unless the further fact is of importance, that there was no competent and sufficiently diligent lookout on either vessel. The duty of the lookout seems to have been left entirely to the pilots of the tugs. The arrangement of the deck hands on the Cheney does not show that any of them was keeping watch, or that any of them was in a position to see or did see, and the same is the case with the Palmer. It is probable that the Cheney would answer that, hearing no response to her long whistle, she had a right to believe that the channel was clear, and that no lookout was required in that regard, and that in any case a lookout would not have aided in preventing the collision. This contention implies that a tug, running for 450 feet along an inclosed pier, shutting off all view of vessels approaching from down stream, may dispense with the services of a lookout, other than a pilot placed 30 feet aft of the stem, upon the inference that the channel is clear, because the long whistle has not been answered. Such claim does not seem to be justified. But assume that a properly vigilant lookout had been placed in the bow of the Cheney, what would have happened? If the approach of the Palmer had been properly announced, could not the Cheney have starboarded and drawn to the northward, which was her proper course, and have avoided the accident? It appears that when the pilot of the Cheney did see the Palmer he starboarded, and did in fact carry his vessel somewhat to port, but to what extent does not appear. But he was 30 feet aft of the bow, occupied with his wheel. He was not a proper lookout nor suitably located. It is not for the court to indulge in speculations as to what would have happened had the Cheney done her duty. The fact is that she did not have the proper man in the proper place to meet the demand, which the rule of navigation made upon her, and it seems possible, if not probable, that prompt notification from a lookout would have enabled her to swing to port in such a way as to avoid the head-on blow which she received from the float. Such a course was preferable to what was done, or to at-

tempts to pass under the stern of the Palmer, and there was a possibility of success. Unless it should appear to the court that the accident could not possibly have been avoided, even if the lookout was in his place and doing his duty, the Cheney should be regarded as contributing to the accident. Under such a rule, it is considered that the Cheney was culpably negligent. If tugs will go about the harbor without lookouts, they may not expect that the court will conjecture nicely what would have happened if a lookout had been in his place, doing his duty, when a collision occurred.

The damages will be ascertained, and divided between the two vessels.