### THE AUTOMATIC.

(Circuit Court of Appeals, Second Circuit. December 14, 1921.)

No. 77.

**Towage ⟶11(5)—Tug held liable for injury to tow from collision.**

A tug *held* liable for damage to a barge in tow from collision with an unidentified steamship at night in New York Harbor, where the master, who had previously supposed the steamship to be anchored ahead and off his port bow, when 1,000 feet away, saw that she was moving on a crossing course, but, instead of obeying the starboard hand rule, ported his helm.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Frederick Starr Contracting Company against the tug Automatic; the Tice Towing Line, claimant. Decree for respondent, and libelant appeals. Reversed.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones and L. J. Matteson, both of New York City, of counsel), for appellant.

Park & Mattison, of New York City (Samuel Park, of New York City, of counsel), for appellee.

Before HOUGH and MAYER, Circuit Judges, and AUGUSTUS N. HAND, District Judge.

MAYER, Circuit Judge. The libel was filed by the owner of the scow John Donnelly against the steam tug Automatic to recover damages sustained by the scow as the result of a collision between the scow and an unidentified steamship on April 13, 1918. The story of the collision is most unusual and is told by witnesses for the tug. Nevertheless, as the events recited by those witnesses are not impossible, we are not disposed to characterize their testimony as imaginative when, so far as the record discloses, they are reputable harbor men.

The contention of the libelant is that the Automatic brought her tow into collision with an anchored vessel, or, if not, then that she was at fault for failing to hold her course and speed. The first contention requires that we should discredit the tug's witnesses, and speculate as to just where she and the vessel with which her tow collided were at the time of collision. In our view of the case, neither of these courses is necessary.

The master of the Automatic had been a licensed man in the harbor for seven years. About 2 a. m. on the morning of April 13, 1918, he took the scow John Donnelly in tow at Long Island City. The John Donnelly is a deck scow, 100 feet long over all, 82 feet between bulkheads, and 29.2 feet wide. At Forty-Sixth street, East River, another scow was taken in tow and made fast to the stern of the John Donnelly. The two scows were made fast end to end, not more than 2 feet apart. The tug put out two hawsers, about 10 fathoms long, one to each of the forward corners of the John Donnelly. The tug and tow were bound for the Federal Shipyard at Newark, N. J.

About 3 :30 or 4 a. m., the tug went down the East River. The night was clear, and the tide ebb. The testimony of the master developed the facts which follow. He was in the pilot house, and his deckhand was there with him. He went down between the Battery and Governor's Island. He saw a steamer with two anchor lights and deck lights off his port bow from two to three points. The master of the Automatic was heading for Robins Reef light, and when he first saw the steamer he was "coming around Governor's Island." The steamer was in the channel "way outside" of the anchorage ground. There were no other boats "around there," and the master of the tug navigated as though the vessel were at anchor, in view of the fact that she showed anchor lights, and not running lights. The lights on the steamer were electric lights. His testimony on direct examination then was:

"Q. Did you navigate as though that vessel were at anchor and would remain there? A. Yes.

"Q. If she had done so, how much would you have cleared that steamer? A. Oh, 1,000 feet.

"Q. When did you first suspect that she was not at anchor, but that she was in motion? A. When I saw her coming so fast for us.

"Q. How far was she from you at that time? A. Oh, 500 feet."

On cross-examination the master testified:

"Q. How close were you to her when you first appreciated that she was moving? A. About 1,000 feet away. * * *

"Q. Did you realize that she was moving when she was 1,000 feet away?
A. Yes. * * *

"Q. Will you draw a line, and show me on this piece of paper his heading up the river and your heading across the river, with the steamer 3 points on your port bow? (The witness indicates on paper.)

"Q. This was at the time that you realized that the steamer was moving?
A. Yes.

"Q. And you say at that time she was 1,000 feet from you? A. Yes."

On redirect the master testified:

"Q. I think you said, in answer to a question I put to you, that you thought she was about 600 feet away when you blew the first whistle to her, and in answer to Mr. Jones you said she was 1,000 feet away; is that an estimate of judgment on your part? A. Yes.

"Q. Which do you think is the nearest? A. 1,000 feet; I should think; between 600 and 1.000 feet.

"Q. Between 600 and 1,000 feet is your best judgment? A. Yes."

It will be noted that in the first part of this answer the master said 1,000 feet, and later modified this estimate to "between 600 and 1,000 feet." While we are appreciative that distance in such circumstances cannot be accurately measured, we are satisfied that the master believed that he was about 1,000 feet away when he first realized that the steamer was moving and not anchored. At that time he blew the steamer one whistle and put his wheel to port; but, prior thereto, he had noted that the steamer did not change her bearing, and when he saw her first she was about a quarter of a mile away. He further testified that, when he was 1,000 feet away, he realized that the tug and steamer were on crossing courses and that the steamer was on the tug's port bow. The tug was going "maybe" about 6 miles an hour, and the steamer "may have been going" 5 or 6 miles an hour. The steamer made no change in her course.

As a result of putting the helm to port, the tug went to starboard, and then the master blew the danger signal, got no answer, then put his wheel hard aport, then saw the ship "was coming right for us," then swung the tow right around, and headed right up the river again. As soon as the scow was swung around, the master put the wheel hard astarboard again, to swing the scow's corner away from the steamer. He got away from the stern of the steamer, but the anchor of the steamer, which was hanging over its side, behind the stern, and the scow came in collision about 10 feet behind the corner of the scow on the port side.

The master ordered the hawsers cut, and this the deckhand did at the time of collision, and when the master saw he had the corner of the scow clear he blew to let the deckhand know to let go. The master then "hollered" to the man on the bow of the steamer that the latter had no running lights, and the man said he knew that. The master, however, could not get close enough to the steamer to make out its name, and, after diligent effort thereafter, neither the master nor the Tice Line, the owner of the tug, could ascertain the name of the unidentified steamer.

The engineer in effect corroborated the master and testified that the steamer was moving. The deckhand testified that the steamer was about 1,200 feet away when he first saw her, and about 800 feet away

when he saw that the vessel was moving. His testimony substantially corroborated that of the master. The testimony of the scow captain was of no service on the point here under consideration. The testimony of the master is consistent with his report on May 9th to the local inspectors.

It is, of course, now elementary that libelant must prove negligence; but, as said in The Delaware (C. C.) 20 Fed. 797, "the occurrence suggests an inference of negligence on the part of the tug which it devolves here to repel." We have accepted the master's testimony, and from his story it is clear that the tug and the steamer were on crossing courses. The case was not one of special circumstances. The fact that the steamer did not have running lights was, of course, exceedingly strange. Whether she was unused to these waters, and supposed she was in anchorage ground, and was changing her position, or whatever the reason or occasion for her conduct, we shall not attempt to guess; but she never changed her course, and, at a distance of 1,000 feet, the tug was so circumstanced that there was no difficulty in adhering to the rule.

Departure from the rule might only invite some unexpected maneuver from the approaching vessel. The master, as was his duty, thoroughly understood the rule, and he stated it succinctly when he said:

"The one that has the other on his own port side will proceed and keep her course and speed."

Hardship, of course, sometimes results from a compliance with rules, where a navigator thinks departure may be the wiser course; but, in the long run, safe navigation is better served by strict application of the rules than by resort to exceptions in order to exculpate. As recently said in The Binghamton (C. C. A.) 271 Fed. 69:

"The statement or wording of the rule can no longer be questioned in this court. It is the duty of the privileged vessel to keep 'on her course until a departure is necessary to avoid immediate danger,' and the rule as to speed is the same as that regarding the course. Yang-Tsze Ass'n, etc., v. Furness, 215 F. R. 859, 861, 132 C. C. A. 201, certiorari dismissed 242 U. S. 430, 37 Sup. Ct. 141, 61 L. Ed. 409."

There is no explanation by the master for his failure to observe the rule, except, perhaps, the existence of the anchor lights; but this is not enough on the facts in this case. The result is that, in this controversy between tug and tow, we cannot say that the collision might not have been avoided if the rule had been observed.

Finally, it is urged that libelant's pleading does not suggest its present contention; but it will be noted that the libel charges as a fault that "the Automatic failed to keep her tow clear of the steamer with which she collided." This general allegation was sufficient, and all which could be expected of libelant when all the facts were in possession of those on the tug. The case below was clearly tried on the theory that, in any event, the rule was violated.

The decree is reversed, with costs, and the District Court is instructed to enter the usual decree in favor of libelant against the Automatic, with costs.