### THE LEXINGTON.

### NEW YORK, N. H. & H. R. CO. v. COLONIAL NAV. CO.

### THE TRANSFER NO. 15.

### COLONIAL NAV. CO. v. NEW YORK, N. H. & H. R. CO.

Nos. 389, 390.

Circuit Court of Appeals, Second Circuit.
Aug. 12, 1935.

Duncan & Mount, of New York City (H. W. Dieck, Jr., and C. R. Millett, both of New York City, of counsel), for appellant.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Frederic Conger, both of New York City, of counsel), for appellee Colonial Navigation Co.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The libelant's tug, Transfer No. 15, with loaded car floats on either side which were each 357 feet long and extended about 200 feet forward of the tug's bow, was, in the early morning of February 7, 1929, somewhat west of North Brother Island in the East River on her way to the libelant's float bridges at Oak Point on the Bronx shore to the north of North Brother Island. A ferryboat overtook and passed her to port while she stopped her engines to permit that to be done. She started on, and soon after sighted the claimant's passenger and freight steamer Lexington some 700 to 900 yards ahead proceeding westerly toward the float bridges and showing her red light. The ferryboat, going on, passed the Lexington safely port to port. At this time the Lexington was well over toward the Bronx shore. The channel between that shore and North Brother Island, being about 1.100 feet wide, is admittedly one to which the narrow channel rules apply except as modified by a claimed custom which will be touched upon later.

If no custom as claimed prevails and was to be observed by these vessels, the situation when the tug and ship sighted and were bound to navigate with reference to each other was either one of meeting or a crossing situation in a narrow channel with the tug the burdened vessel. There is considerable conflict in the evidence as to this point, and that was resolved by the court below in favor of the claimant to the effect that the vessels were on crossing courses. We believe that finding should be sustained. The course of the tug would naturally be somewhat across the channel, though there is evidence that tidal conditions made it necessary for her to cross not as diagonally as a course, from her position when she sighted the Lexington, directly to Oak Point would take her because she had to go past the float bridges to Tiffany street where she would turn and come back to enter them. The tide was flood, flowing about two knots, the weather rainy, and visibility fair. After the ferryboat passed the Lexington, that ship first saw the No. 15 come into sight from behind North Brother Island showing her green side light and her towing lights. This is not only what might reasonably be expected, but is in accord with much of the evidence, and was believed by the trial judge. Accordingly we accept it.

It is clear that, if the pilot rules control unmodified by custom, the tug was the burdened vessel and her indicated normal course was to keep out of the way of the Lexington by going under her stern. However, when the tug saw the Lexington, she blew two whistles to propose a starboard to starboard passing. This was answered at once by two from the Lexington and followed by that ship's attempt to starboard her helm enough to make the proposed passing possible. The attempt was unsuccessful, and it was soon

254

evident that it would be. The Lexington then blew several three-blast signals and reversed. The No. 15 came on so closely that her starboard float struck the Lexington's bow when the vessels were about 200 feet off the float bridges, scraped along nearly the length of the car float, and finally brought up against the stern of car float No. 56 which was lying at the bridges.

■ The second disputed point relates to the claimed custom which the libelant contends is shown to have been established to apply on the flood tide to all vessels and tows in this channel. It is as put by one witness that "The vessel bound west favors the Island, because of slack water, and that allows the other vessel to swing outside of him—outside of the westbound vessel." This claim of custom was categorically denied by several witnesses, and again the trial court found in accordance with the claimant's evidence that there was none which applied to these vessels. Again we think that finding was justified and should be accepted. Much reliance is placed by the libelant upon the recognition by this court in The C. Gallagher, 262 F. 97, of such a custom in respect to hawser tows in this channel. The custom there given effect is limited, however, to hawser tows with which we are not now concerned, and so the decision sheds no light upon the situation before us.

■ With the fact established that the vessels were on crossing courses coupled with a failure to justify the navigation of the tug by showing that it was in accordance with an established custom, we have only a case where the burdened vessel elected to perform her duty to keep out of the way by crossing the bow of the privileged vessel after obtaining her assent to the maneuver. In so doing the tug took the risk. The Lexington did her best to co-operate, and yet the attempt to cross safely failed. By her agreement to help carry out such a crossing, the Lexington did not undertake to keep out of the way of the tug while that vessel crossed her bow but only to do what she could to make it possible for the tug to keep out of her way in so doing. When it was made, the vessels were far enough

apart to make the proposal one having reasonable chances of success. That was enough to justify the Lexington in assenting. Lehigh C. & Nav. Co. v. Compagnie Generale Transatlantique (C. C. A.) 12 F.(2d) 337. In The Nereus (D. C.) 23 F. 448, 455, and 456, Judge Brown so well stated the legal effect of navigation like what was shown here that the following paragraph is quoted:

"A steamer bound to keep out of the way of another steamer by going to the right, under the inspectors' regulations, has no right, when under no stress of circumstances, but merely for her own convenience, to give the other steamer a signal of two whistles, importing that she will go to the left, unless she can do so safely by her own navigation, without aid from the other, and without requiring the other steamer to change her course or her speed. Otherwise she would be imposing upon the latter steamer more or less of the burden and the duty of keeping out of the way, which by statute is imposed on herself. When two blasts are given under such circumstances, the steamer bound to keep out of the way thereby in effect says to the other: 'I can keep out of your way by going ahead of you to the left, and will do so if you do nothing to thwart me; do you assent?' A reply of two whistles, in itself, means nothing more than an assent to this course, at the risk of the vessel proposing it. Such a reply does not of itself change or modify the statutory obligation of the former to keep out of the way as before, nor does it guaranty the success of the means she has adopted to do so."

What the agreement did was to make the situation one of special circumstances. The Newburgh (C. C. A. 2) 273 F. 436. The privileged vessel assumed the duty to co-operate, and the burdened vessel, receiving such co-operation, assumed the risk involved in the choice she made. As the tug did not keep out of the way despite such co-operation as the steamer was able to give, she must be charged with fault which caused the collision. The Lexington (C. C. A.) 275 F. 279; The Thielbek (C. C. A.) 241 F. 209.

Affirmed.