THE GRACE A. BARRETT.

THE GOLD STAR MOTHER.

BARRETT v. CITY OF NEW YORK.

CITY OF NEW YORK v. THE GRACE A. BARRETT.

District Court, S. D. New York.

June 3, 1947.

834

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncy I. Clark and Charles E. Wythe, both of New York City of counsel), for The Grace A. Barrett.

Charles E. Murphy, Corp. Counsel, of New York City (George S. Franklin, of New York City, of counsel), for City of New York.

LEIBELL, District Judge.

On December 22, 1943 a libel was filed by Edward E. Barrett, as managing owner of the steamtug Grace A. Barrett, against the City of New York, as owner of the ferryboat Gold Star Mother, for $20,000 damages arising out of a collision between the tug Barrett and the ferry Gold Star Mother in New York Harbor on September 27, 1943 which libellant alleged was caused solely by the fault and negligence of the Gold Star Mother. The City of New York filed its answer to the libel on May 6, 1944, denying the allegations of fault and negligence, and on the same date filed a cross-libel against the tug Grace A. Barrett for $1,000 damages sustained by the City of New York by reason of the alleged negligence and fault of the tug. The claimant, Edward E. Barrett, filed an answer to the cross-libel on April 27, 1945 denying any fault or negligence. The libels were tried together on January 29-30, 1947.

The Barrett's Version of the Collision.

The Grace A. Barrett, built in 1941 was a wooden hull steamtug, 99.5 feet in length, 24.7 feet in beam; depth 12.2 feet; 176 tons gross weight, with a single screw and developing 450 horsepower. On the morning of September 27, 1943 she departed from Morse Drydock, Brooklyn, New York City, bound for Port Newark, New Jersey, and proceeded down Bay Ridge Channel and thence on a general northwesterly course from the lower end of Bay Ridge Flats towards Kill van Kull in the Upper Bay, just north of the ferry racks at St. George, Staten Island. She was near one of the cross-roads of the Upper Bay. The weather was clear with a light southwest wind prevailing and the tide was the first of the ebb. Visibility was good. The mate of the Grace A. Barrett, a licensed pilot, was in charge of the navigation of the tug. He was in the wheelhouse alone. A deck hand was in the kitchen near a door. The captain was some place below. The pilot was the only man above deck. The Barrett was proceeding light, at full speed (8 knots), when her pilot first observed the ferryboat, Gold Star Mother, just below Robbins Reef Bell Buoy (No. 27), bearing about 4 points or broad on the tug's starboard bow, distant about 2,000 feet, proceeding in a southwesterly direction at a speed he estimated to be about 16 knots.

Britain, the pilot of the tug, testified that he did not observe any other vessels in the immediate vicinity; in particular he did not observe a tug with carfloats in tow which at that time was about 700 feet ahead of the Barrett and about 50 feet to the southward proceeding in the same general direction as the Barrett. The tug's pilot also testified that having observed the ferry on his starboard bow, he rang a stop signal to the engine room in order to permit the ferry to maintain its course and cross his bow; that when the ferry was about 1,500 feet distant from the Barrett, about one-half minute after the execution of the stop signal, he rang a full speed astern signal to the engine room. He says that the ferry, when about 1,000 or 1,200 feet away, executed a change of course to port of about 5 points or 56°, and sounded a two blast whistle signal when 300 or 400 feet away. Such a signal would indicate that the ferry intended to pass astern of him and that he was permitted to cross her bow. He testified that he did not answer the signal with an assenting two blast signal because he did not have any headway on at the time and did not believe he could get enough on to cross the ferry's bow in compliance with the signal. He says he continued backing at full speed and sounded a three blast backing signal. The

Barrett was a single screw ship and the execution of this maneuver would cause her stern to turn somewhat to port.

The ferry continued its approach and although its quick water indicated that her engines were backing just a moment before the collision, she came on to collide with the Barrett at about 8:55 according to the tug's clock. The point of impact was about 10 or 12 feet aft of the ferry's bow on the starboard side. The overhang of the ferry's main deck sheared off the upper portion of the tug's bow, about 2 feet above the water line, from the stem back for a distance of about 4 feet.

Britain contradicted some of his own testimony, testifying later that he stopped the tug when 800 or 900 feet from the ferry and started to go back; and in another part of his testimony he said that the tug was actually backing when 1,000 or 1,200 feet from the ferry.

The Barrett's engineer, Davis, who was in the engine room at the time, testified that he got a bell to slow and seconds later a signal to stop the engines, and that after two or three minutes he got two bells to go astern, and then a hook up bell to go full speed astern; and that the collision occurred about a minute or two after the full speed astern bell. He got an order to stop the engines a couple of minutes after the collision.

Anderson, the deck hand, who was in the kitchen having coffee for about 10 minutes before the collision, looked through the kitchen door on the starboard side and saw the ferry heading right for them, about two or three lengths away. He testified that the ferry blew two whistles and that the tug blew three and stopped. It looked as if the ferry turned right toward the tug. The collision occurred a few seconds later. The tug captain, who was below, hurried up to the wheelhouse right after the collision. He was not a witness. The failure to produce him was not explained.

### The Ferry's Version.

The Gold Star Mother is a double-end ferryboat operated by The City of New York between St. George, Staten Island, and Whitehall Street, New York City. She is 252.5 feet in length; 47.8 feet in beam; depth 18.1 feet; 2,126 tons gross weight; and develops 4,000 horsepower driven by screws placed fore and aft.

On the morning of September 27, 1943 the Gold Star Mother departed from the ferry slip at Whitehall Street, New York City at 8:32 A.M., on her regular route bound for St. George, Staten Island. Shortly after clearing the slip the Captain turned the wheel over to Edward P. Ferrell, a licensed pilot, and the ferry proceeded at full speed (13–14 knots) down the main ship channel in the Upper Bay on a southwesterly course about 150 to 200 feet east of the line of channel buoys marking the westerly limits of the channel. About halfway between buoys number 27 and 29 the pilot observed a tug (the Eleanor Bush) with two carfloats in tow, one on each side, bearing about 3 points or 33 degrees off the ferry's port bow, distant about 2,000 feet, and proceeding on a northwesterly course so as to cross the ferry's projected course at right angles. Without any exchange of signals between the vessels the Gold Star Mother's pilot rang up an "ahead slow" signal on the engine order telegraph, and the engines responded, in order to permit the tug Eleanor Bush with carfloats to pass ahead of the Gold Star Mother. After continuing on ahead slow for about one minute he rang up a stop signal on the engine order telegraph to allow the tug with carfloats to clear his bow.

About a half-minute after first observing the tug Eleanor Bush with carfloats, the ferry pilot observed the tug Grace A. Barrett about 3 points on the port bow, distant about 1,800 or 1,900 feet, on the same course as the Eleanor Bush and carfloats and astern thereof about six or eight hundred feet, proceeding at a greater speed than the Eleanor Bush and the carfloats. As the ferry pilot sighted the Grace A. Barrett she was not dead astern of the carfloats but about 50 feet outside of their starboard side towards the ferry.

The carfloats crossed the ferry's bow from port to starboard, about 600 feet ahead. The Barrett at that time was about 400 feet astern of the carfloats. The ferry pilot's testimony on positions and distances contains some contradictory statements. The ferry pilot asserts that the Grace A.

Barrett then sounded two blasts indicating a request to cross the ferry's bow and that the maneuver was assented to by the ferry by an answering two blast whistle signal to the Barrett, and that at that time the ferry was completely stopped. He also testified that he saw the Barrett continue on her course and cross the Gold Star Mother's bow from port to starboard about 200 feet ahead and that while she was off the starboard bow of the ferryboat the Barrett turned hard right executing a 90° swing to starboard and approached the ferry head on. The ferry's pilot then rang up full speed astern and sounded three blasts on the whistle. The Barrett also sounded a three blast signal when within 30 feet of the ferry's bow. The captain of the ferry took over the wheel from Ferrell after the ferry blew three whistles. The ferry pilot thought that the tug pilot made a mistake in turning his wheel the wrong way. He testified: "But still he wanted to get away from the ferryboat. The more he was putting the right rudder on it, instead of her going away, he was coming right toward us". He also testified that the ferry had actually backed about 150 feet in 20 seconds.

Captain Clohessy of the ferry testified that he saw a Bush tug, with two carfloats, about 1,200 feet ahead, a little off the port bow, crossing the ferry's course, coming from the direction of Brooklyn, bound West towards the B. & O. R. R., Arthur Kills. He told his quartermaster (the pilot Ferrell) to slow down and the ferry was put on the slow ahead in order to allow the Bush tow to cross the bow of the ferry. Ferrell was at the wheel at the time. Slow ahead is 3 or 4 knots for the ferry. The ferry kept going ahead on slow for about 300 or 400 feet. The ferry captain noticed the Barrett about 400 or 500 feet astern of the carfloats, going in the same direction, just as the carfloat crossed the bow of the ferry at a distance of 400 or 600 feet. Right after that the Barrett blew two whistles which the ferry answered with two, and the ferry's engines were stopped altogether. After the engines had been stopped for 30 seconds or so, the Barrett went across the ferry's bow, not quite across but about a point off the ferry's starboard bow and

sheered hard right and came into the ferry. The pilot (Ferrell) immediately put the ferry full speed astern.

The captain then took over the wheel. The ferry's engines were going full speed astern and he blew backing whistles, three whistles, but the Barrett hit the ferry on the starboard bow about 10 or 12 feet from the stem. At the impact the Barrett was heading for New York as if she had been coming from St. George. At the time of the impact the ferry was just beginning to show backing water around the ferryboat. Just before the impact when the Barrett was about 15 feet off she blew a backing whistle, a few seconds after the ferry's backing whistle.

When the ferry captain first saw the Barrett he intended to go full speed ahead and pass between the carfloats and the Barrett. Then he heard the Barrett blow two whistles which the ferry answered with two whistles. The Barrett was then about a point on the ferry's port bow, about 350 feet off. The ferry was given just a little port wheel. The engines were stopped immediately after the ferry gave the two whistles. The engines of the ferry were backed about 15 or 20 seconds before the collision. The ferry's headway was practically off at the time. The Barrett was about 175 feet ahead of the ferry's bow when she started to sheer into the ferry. At that time he had the pilot put the ferry full speed astern and blow backing signals. The captain put the wheel hard left when the headway was practically off. He had given the ferry a little less wheel at the time the ferry blew two whistles. The ferry was starting to go into backward motion at the time of the impact but there was no quickwater behind the tug which was "heading in under a hell bent speed". The ferry captain also testified that the ferry had a speed of 13 miles an hour when going full ahead; that if the engines were stopped, the ferry would continue for about 1,800 feet before stopping; and that 3 or 4 knots was the ferry's speed on slow ahead. She was moving about 6 miles an hour when the ferry's engines were stopped. According to the captain and the engineer they were stopped for about half a minute before being put

at full speed astern. The collision occurred about 10 to 20 seconds later.

One of the ferry's engineers (Oppel) described the bells he received before the collision. The engines had been running full ahead and he got a slow bell. The engines operated on that for about a minute. Then he got a stop bell and in 15 or 30 seconds he got a full astern. After they were going astern for about 7 or 10 seconds there was a slight bump. Full speed was 14½ miles through the water.

The mate (H. Search), who collects the tickets from the automobile drivers, testified that he was in the pilot house counting the tickets. He saw the carfloat about 1,500 feet ahead, heading towards the Kills. The ferry's engines were slowed down to let the carfloat go by. He saw the tug Barrett when it was about 400 or 500 feet away. She was astern of the carfloat about four or five hundred feet, going in the same direction. He heard the Barrett blow two whistles and the ferry answered with two. When the tug was dead ahead of the ferry, the tug sheered to the right all of a sudden when only 200 feet ahead. The ferry blew three backing whistles, but the tug hit the ferry on the starboard bow. There was not room enough for the ferry to go behind the carfloat and in front of the tug Barrett.

### Discussion

There is a sharp conflict in the testimony regarding the exchange of whistle signals between the Barrett and the Gold Star Mother. Philip Britain, the Barrett's mate, testified that the first signal sounded was a two blast whistle signal by the ferryboat, Gold Star Mother, with which he could not comply and which he answered with a three blast signal indicating that he was backing. This version of the exchange of whistle signals was supported by two witnesses, Henriksen and Richards, who were piloting tugs in the vicinity. Another witness, Nilson, also a tug pilot, heard only a two blast signal from the ferry and later a three blast signal, also from the ferry.

The pilot and captain of the ferry, on the other hand, maintain that the tug Barrett sounded the first two blast whistle signal and that the ferryboat replied with an assenting two blast signal. Their statement is supported by two witnesses, Lembke and Ludwig, who were passengers on the ferry at the time of the collision.

After reviewing all the evidence I am convinced that the pilot of the Barrett wished to follow the Bush tug (with the carfloats in tow) across the ferry's bow and therefore he initiated the exchange of whistle signals by sounding a two blast signal on the Barrett's whistle to which the ferry assented with a two blast signal. There was thus a proposal by the Barrett to cross ahead of the Gold Star Mother and an assent to this proposal by the ferryboat.

■ At the time the Barrett and the Gold Star Mother sighted each other they were proceeding on courses at right angles to each other and within 2,000 feet of each other. A crossing situation obviously existed and was recognized as such by the pilots of the respective vessels. The Ashley, 2 Cir.; 1915, 221 F. 423; The Tamanend, D.C.Pa.1929, 40 F.2d 288. Such a situation is controlled by Articles 19, 21 and 23 of the Inland Rules of the Road. Article 19, 33 U.S.C.A. § 204 provides that: "When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

■ In the light of this rule the tug Grace A. Barrett was the burdened vessel and had the duty to keep out of the way of the Gold Star Mother, the privileged vessel. Another duty of the burdened vessel is set forth in Article 23, 33 U.S.C.A. § 208, which provides: "Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

■ The corresponding duty imposed by these rules on the privileged vessel is set forth in Article 21, 33 U.S.C.A. § 206 as follows: "Where, by any of these rules, one of two vessels is to keep out of the way, the other shall keep her course and speed."

For a discussion of these rules governing a crossing situation and the proper sound signals for vessels in sight, see Knight's Modern Seamanship, 10th Ed., pp. 439–441.

See also The Norfolk, D.C.Md.1924, 297 F. 251, 255; The Automatic, 2 Cir., 1921, 278 F. 359.

While these rules govern the conduct of vessels and regulate their navigation in respect to one another in a crossing situation, the vessels may reach an agreement to proceed contrary to the rules. If the proposal to deviate from the rules is made by the burdened vessel and assented to by the privileged vessel the burdened vessel assumes the risks involved in the maneuver and is not relieved of its initial obligation to keep out of the way of the other vessel. The Nereus, D.C.S.D.N.Y.1885, 23 F. 448, 454; The Newburgh, 2 Cir., 1921, 273 F.436, 439; The Lexington, 2 Cir., 1935, 79 F.2d 252, 254. In the Nereus, supra [23 F. 455], the language of Judge Brown states the intent and result of such an agreement: "When two blasts are given under such circumstances, the steamer bound to keep out of the way thereby in effect says to the other: 'I can keep out of your way by going ahead of you to the left, and will do so if you do nothing to thwart me; do you assent?' A reply of two whistles, in itself, means nothing more than an assent to this course, at the risk of the vessel proposing it. Such a reply does not of itself change or modify the statutory obligation of the former to keep out of the way as before, nor does it guaranty the success of the means she has adopted to do so."

As far as the privileged vessel is concerned she no longer has the obligation to maintain her course and speed; she may stop her engines, back or change her course to port to pass astern of the burdened vessel, as circumstances dictate. This is a natural consequence of the agreement for the burdened vessel to pass ahead of the privileged vessel. The proposal of the burdened vessel when accepted creates a situation of special circumstances and the vessels are obligated to navigate in accordance with Article 27 of the Inland Rules, T. 33 U.S.C.A. § 212, which provides: "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

However, the privileged vessel by its assent does assume an additional obligation which appears to be the criterion in measuring its liability under the agreement. The duty of the privileged vessel in such cases is to cooperate and to do nothing to thwart the maneuver agreed upon. Pitney v. United States, 2 Cir., 1945, 149 F.2d 907, 909; The Lexington, 2 Cir., 1935, 79 F.2d 252, 254; The Boston, 2 Cir., 1921, 277 F. 36, 40; The M. Vandercook, D.C., 88 F. 559, affirmed 2 Cir., 1900, 105 F. 1004; The Arthur M. Palmer, D.C.S.D.N.Y.1902, 115 F. 417.

In the light of these established principles it appears that the Barrett, the burdened vessel, assumed the risk of a crossing contrary to the rules; and the Gold Star Mother's assent to the maneuver would not, in and of itself, make her liable for any part of the damage if a collision resulted. The ferry's assent did not lighten the Barrett's burden to keep clear; and by giving her assent the ferryboat assumed the burden of cooperating fully to make the maneuver a success.

The Gold Star Mother was not without fault in the maneuvers that followed the exchange of two blast signals. The engine room log of the ferryboat contains the following entry: "Received stop signal about 8:50 A.M.: Full speed astern about 8:51 With engines going full speed astern felt slight bump, No apparent damage below deck."

The ferryboat's assistant engineer described the bells as follows: A slow bell for about a minute; a stop bell for about 15 to 30 seconds; full astern for 7 or 10 seconds before the impact.

The Captain of the ferry testified that: "After we had stopped the engines for—had been stopped a period of thirty seconds or so, this Barrett went across my bow, not quite across, about a point off my starboard bow, when he sheered hard right and hit me—came into me and immediately, that is, the pilot immediately put her full speed astern. * * *" To the question "What was the motion of the ferryboat, forward or astern or standing still at the time of the impact, if you know", the Captain replied: "At that time she was just beginning to

show backing water around the ferryboat, at the time of the impact."

The pilot of the ferryboat testified that he had stopped her engines to permit the carfloats to pass and that the ferry was completely stopped when the Barrett gave two blasts. With respect to the backing of the ferry the pilot testified that he gave the order to back about 20 seconds before the collision.

In The M. Vandercook, D.C.S.D.N.Y. 1898, 88 F. 559, a tug and ferryboat approaching each other on converging courses agreed by an exchange of signals that the tug, the burdened vessel, should cross ahead of the ferryboat. The tug maneuvered accordingly but the ferryboat pursued her course without materially slackening her speed. Under such circumstances the court held the ferry alone at fault for the resulting collision because of her failure to allow the tug sufficient space to effect a crossing.

In the instant case the Gold Star Mother assented with two blasts to a two blast signal of the Barrett, and the testimony of its officers and the entries in the engine room log indicate that at the time she had way on. She continued to close in on the Barrett, in violation of her duty to assist the Barrett's maneuver and to do nothing to embarrass the Barrett in her execution. Stopping her engines and going somewhat to port was not enough. She should have backed her engines promptly to avoid getting too close. By the failure of the ferryboat to take full precautions the vessels were brought too close for safety. See The Boston, supra; The M. Vandercook, supra; The Sammie, C.C.N.Y.1889, 37 F. 907; The Arthur M. Palmer, supra. The violation of this duty was a fault contributing to the collision.

The agreement between the vessels to effect a crossing contrary to the rules created a situation of special circumstances. In The Newburgh, 2 Cir., 273 F. 436, 439, the Court said of an agreement to cross contrary to the rules: "The situation, at least in this circuit, after the agreement, is one of special circumstances. The George S. Shultz [2 Cir.], 84 F. 508, 510." The vessels thus would be placed within the purview of the General Prudential Rule, Article 27, 33 U.S.C.A. § 212, quoted above.

In a recent case in the Circuit Court of Appeals, Second Circuit (National Motorship Corporation v. Pennsylvania Railroad Company, 160 F.2d 510), Judge Learned Hand quoted from the admonition of Judge Brown, in The New York, 175 U.S. 187, 207, 20 S.Ct. 67, 75, 44 L.Ed. 126, that, "The lesson that steam vessels must stop their engines in the presence of danger, * * * is a hard one to learn". The pilot of the ferry, intending to permit the Barrett to cross ahead or planning to pass astern of the Barrett, in view of the close proximity of the vessels, should have stopped the engines of the ferry and backed at once. The ferry had powerful engines and a screw fore and aft. Instead he came on, veering somewhat to port. The ferryboat had way on with her engines stopped.

The Barrett was also at fault for failing to navigate in accordance with her two blast signal. Apparently the Barrett abandoned the maneuver or modified it in the midst of its execution. See The Transfer, No. 9, 2 Cir., 1909, 170 F. 944; The St. Johns, C.C.S.D.N.Y.1890, 42 F. 75. There is no testimony of the Barrett to explain why the Barrett abandoned the maneuver, since the Barrett contends that she never sounded two blasts and never proceeded to cross the ferry's bow. Something went wrong with the Barrett's navigation. The Captain of the Barrett should have heard the signals sounded by his own tug. If his tug had been backing for a minute or two it should have brought him out on deck. I believe that the tug did initiate the maneuver to cross the bow of the ferryboat. Perhaps the explanation of the Barrett's movements lies within her captain's knowledge. He knew something that would have been damaging to the Barrett's case, at least that is the presumption created by his failure to testify. The New York, 1899, 175 U.S. 187, 204, 205, 20 S.Ct. 67, 44 L.Ed. 126.

Of course, if the Barrett and the ferryboat were so close together when they exchanged the two blasts that the execution of the maneuver was hazardous, then both would be at fault for that reason alone. In The Nereus, D.C., 23 F. 448, at page 455, Judge Brown wrote: "The Nereus was in fact so near that any attempt to pass her bows in that manner was dangerous and un-

840

justifiable, whether on agreed signals or not; and if there had been actually assenting signals between the two vessels agreeing upon this mode of passing each other, it would have been at the risk of both, because a grossly hazardous undertaking, adopted without necessity, and in direct disobedience of the rule to go to the right. The City of Hartford [Fed.Cas. No. 2752], 11 Blatchf. 72, 75."

There is a collateral issue, the presence of a tug (the Eleanor Bush) with carfloats in the vicinity of the collision, as to which the evidence appears to be in conflict. The master, the pilot and the mate of the ferryboat state .that the tug, a Bush Terminal Company tug with carfloats, crossed the ferry's bow just ahead of the Barrett. The mate of the Bush tug testified that he was called to the bridge by the captain and there observed the tug Barrett and the ferryboat Gold Star Mother in a head on position after they had collided, and that the carfloats were only 100 feet from the Barrett. Neither the pilot of the tug Barrett nor the other witnesses piloting tugs in the vicinity who had observed the collision made any note of the presence of the Bush tug.

The towing report of the Bush tug for September 27, 1943 (Ex. B.) shows that the tug departed from 51st Street, Brooklyn, New York, at 8:15 A.M. bound for the Baltimore and Ohio piers and bridges located about 650 feet north of the St. George, Staten Island ferry slips. In these circumstances the tug would proceed on a course which would cross the path of a ferry approaching the St. George ferry slips. The towing sheet of the Bush Company tug records the tug's time of arrival at the Baltimore and Ohio pier No. 5 as 8:50 A.M. The collision between the Barrett and the Gold Star Mother was logged by the ferry at 8:50 or 8:51 A.M. The clocks may very well have been off. I am satisfied that the Bush tug with carfloats was in the vicinity of the collision and had crossed the ferry's course shortly prior to the collision. But it does not appear at all likely that the carfloats were as close as 100 feet to the point of collision. The pilot of the ferry estimated the distance between the Bush tug and

the Barrett, when he let the Bush tug pass to be about 600 or 800 feet. The captain of the ferry estimated the distance as 400 or 600 feet. Indeed at first he intended to pass between the Bush Tug and the Barrett. Under the circumstances described by the witnesses for the ferry about two or three minutes elapsed between the time the Bush tug and carfloats passed the ferry's bow and the time of the collision with the Barrett. It seems likely that the course of the Bush tug in crossing the bow of the ferry, is what suggested to the Barrett's pilot that he should do likewise. The captain of the ferry testified "there was nothing whatsoever around the scene of the collision", that would cause the Barrett to make the turn later and run into the ferry. He thought the pilot of the Barrett misjudged himself or something.

On all the evidence I have concluded that both the tug Barrett and the ferryboat Gold Star Mother were at fault and that this is a case for divided damages. I am filing herewith findings of fact and conclusions of law. An interlocutory decree should be submitted in conformity with the conclusions of law.